**LOUISIANA & P. RY. CO. et al. v. UNITED STATES et al.**

(Commerce Court. November 26, 1913.)

Nos. 90-93.

1. COMMERCE (§ 88*)—INTERSTATE COMMERCE COMMISSION—ORDERS.

Under Interstate Commerce Act Feb. 4, 1887, c. 104, § 15, 24 Stat. 384 (U. S. Comp. St. 1901, p. 3165), as amended by Act June 29, 1906, c. 3591, § 4, 34 Stat. 589, and Act June 18, 1910, c. 309, § 12, 36 Stat. 557 (U. S. Comp. St. Supp. 1911, p. 1297), an interstate common carrier may perform accessorial nontransportation services for a shipper, provided this be done without unjust discrimination, but it cannot be compelled to do so; it may also permit a shipper directly or indirectly to render a service connected with transportation, and may make a just and reasonable allowance therefor, but it cannot be compelled to permit such substituted

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

performance of its own obligations. Therefore an order of the Interstate Commerce Commission not only permitting but requiring a carrier to render certain services to a shipper must necessarily be based on a finding that such services are not only transportation services, but that, in performing them, the carrier acts in the capacity of an interstate carrier, in which respect alone the Commission can exercise jurisdiction.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 139, 141; Dec. Dig. § 88.*]

2. COMMERCE (§ 85*)—INTERSTATE COMMERCE COMMISSION—POWERS.

A common carrier may, as to some of its work, act in a strictly private capacity, and may as to certain shippers, and particularly as to a proprietary company, be a mere plant facility and perform merely plant or industrial services, as distinguished from transportation services, and it is within the powers of the Interstate Commerce Commission to prohibit an allowance for such services in a joint tariff schedule.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 138; Dec. Dig. § 85.*]

3. COMMERCE (§ 98*)—INTERSTATE COMMERCE COMMISSION—FINDINGS.

A finding by the Interstate Commerce Commission after a full hearing that a tap railroad, although an interstate common carrier as to other shippers, is as to a proprietary company a mere plant facility, and that the services rendered to such company are merely plant services, is subject to review by the courts only upon an allegation that it is not sustained by any substantial evidence or that it is arbitrary in being based upon improper distinctions and considerations.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148; Dec. Dig. § 98.*]

4. COMMERCE (§ 98*)—INTERSTATE COMMERCE COMMISSION—FINDINGS.

Arbitrary action in such case can be predicated only on a disregard by the Commission of the very criteria which it adopts to determine the ultimate question of fact or on the adoption in different cases of distinctions without real differences.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148; Dec. Dig. § 98.*]

5. COMMERCE (§ 98*)—ORDERS OF INTERSTATE COMMERCE COMMISSION—RIGHT OF REVIEW.

A tap line railroad company, which is directly affected by an order of the Interstate Commerce Commission respecting allowances made for services by the trunk line company, may have such order reviewed, although it is not directed against the tap line company but against the trunk line company.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148; Dec. Dig. § 98.*]

6. COMMERCE (§ 98*)—INTERSTATE COMMERCE COMMISSION—REVIEW—COMMERCE COURT.

That a petition in the Commerce Court to review an order of the Interstate Commerce Commission also prays for relief which the court is without jurisdiction to grant does not justify its dismissal.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148; Dec. Dig. § 98.*]

7. COMMERCE (§ 98*)—COMMERCE COURT—SUIT TO REVIEW ORDERS OF INTERSTATE COMMERCE COMMISSION—EVIDENCE.

In a suit in the Commerce Court to review an order of the Interstate Commerce Commission, made after a full hearing, on the ground that it is not sustained by any substantial evidence and that the Commission acted

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

arbitrarily, such issues must be determined exclusively by the record made before the Commission, and new evidence is not admissible.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148; Dec. Dig. § 98.*]

8. CARRIERS (§ 26*)—INTERSTATE COMMERCE COMMISSION—DIVISION OF JOINT RATES.

A reasonable division out of joint rates cannot be denied a common carrier for transportation services by the Interstate Commerce Commission because of any past or present derelictions, or even the fear of further violations of law.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 67–82; Dec. Dig. § 26.*]

9. CARRIERS (§ 24*)—REGULATION OF RATES—INTERSTATE COMMERCE COMMISSION.

Common ownership or control of a lumber mill and a railroad which is an interstate common carrier cannot be prohibited by the Interstate Commerce Commission, nor made the basis of a denial to the railroad of rights accorded to another road not so owned.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 60–66; Dec. Dig. § 24.*]

10. CARRIERS (§ 24*)—REGULATION OF RATES—TAP LINES—"TRANSPORTATION SERVICE"—"PLANT SERVICE."

While every actual carrying of material or product at a mill is not a "transportation service," the distinction between transportation and plant service cannot be dependent upon the distance the goods are moved, but whether any particular service involving an actual hauling is industrial or transportation depends upon whether, on the one hand, it is an inter-industry act, a step in the manufacturing process, or, on the other hand, a movement of raw material from without to the mill or of finished product from the mill toward the market.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 60–66; Dec. Dig. § 24.*

For other definitions, see Words and Phrases, vol. 8, p. 7076.]

11. CARRIERS (§ 26*)—REGULATION OF RATES—INTERSTATE COMMERCE COMMISSION—TAP LINES.

Orders of the Interstate Commerce Commission respecting allowances by trunk lines to tap lines, which were also interstate common carriers for some purposes at least, for services in the transportation of lumber products from the mills to the trunk lines, and the division of joint rates as between the trunk and tap lines, *held* arbitrary and unjustifiable, where distinctions were made between mills within from 1,000 feet to 3 miles of the trunk lines and those at a greater distance and between proprietary mills of the tap lines and nonproprietary mills, to all of which mills the same service was rendered.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 67–82; Dec. Dig. § 26.*]

Petitions by the Louisiana & Pacific Railway Company and others against the United States and others, the Woodworth & Louisiana Central Railway Company, Limited, and others, against the same, the Mansfield Railway & Transportation Company and others against the same, and the Victoria, Fisher & Western Railroad Company and others against the same, to set aside orders of the Interstate Commerce Commission; the Interstate Commerce Commission, the Railroad Commission of Louisiana, the Atchison, Topeka & Santa Fé Rail-

way Company, and the Gulf, Colorado & Santa Fé Railway Company, interveners.   Decree for petitioners.

For opinions of Interstate Commerce Commission, see 23 Interst. Com. Com'n R. 277 and 549.

Luther M. Walter, of Chicago, Ill., and H. M. Garwood, of Houston, Tex.. (W. R. Thurmond, of Kansas City, Mo., on the brief), for petitioners.

Blackburn Esterline, Special Asst. Atty. Gen., of Washington, D. C., for the United States.

Charles W. Needham, of Washington, D. C., for Interstate Commerce Commission.

Wylie M. Barrow, of Baton Rouge, La. (Ruffin G. Pleasant, of New Orleans, La., on the brief), for Railroad Commission of Louisiana.

James L. Coleman, of Chicago, Ill. (Robert Dunlap and T. J. Norton, both of Chicago, Ill., on the brief), for intervening carriers.

Before KNAPP, Presiding Judge, and HUNT, CARLAND, and MACK, Judges.

MACK, Judge.   Following the supplemental report of the Interstate Commerce Commission in Star Grain & Lumber Co. v. A., T. & S. F. Railroad, 14 Interst. Com. Com'n R. 364, 17 Interst. Com. Com'n R. 338, in which the Commission, while entering no formal order, condemned the making of allowances and divisions to tap lines for the traffic of proprietary mills, the trunk lines filed with the Commission cancellations of the tariffs which had provided for joint rates with the several petitioners herein.   Thereupon the Mansfield Railway & Transportation Company and others filed complaints requesting that joint rates and through routes with the trunk lines be enforced.   These complaints were made a part of investigation and suspension docket No. 11, under which the Commission entered into a full and complete investigation of the so-called tap line situation in reference to lumbering operations in the Southwest, and more particularly in the states of Arkansas, Missouri, Louisiana, and Texas. It had theretofore entered upon an extensive general examination of industrial lines of all classes, and it had also, on specific complaints at an earlier period, considered the matter as it affected this particular region.   See Central Yellow Pine Association v. V. S. & P. R. R. Co., 10 Interst. Com. Com'n R. 193; Central Yellow Pine Association v. I. C. R. R. Co., 10 Interst. Com. Com'n R. 505; Kaul Lumber Co. v. C. of G. Ry. Co., 20 Interst. Com. Com'n R. 450.

Pending the investigation and final order of the Commission, the cancellation of the joint rates had from time to time been suspended, withdrawn, refiled, and again suspended.   On April 23, 1912, the Commission filed its report in investigation and suspension docket No. 11, entitled "The Tap Line Case" (23 Interst. Com. Com'n R. 277), and on May 14, 1912, its supplemental report (23 Interst. Com. Com'n R. 549), findings, and order.

It found that any allowance or division with respect to the products of the so-called proprietary lumber companies of a large number of tap lines, including all of the tap lines that are petitioners herein,

was unlawful. The order, however, did not affirmatively forbid the trunk lines to make allowances or divisions.

Petitions filed in this court by the petitioners herein were on motion dismissed for want of jurisdiction on the authority of Proctor & Gamble Co. v. U. S., 225 U. S. 282, 32 Sup. Ct. 761, 56 L. Ed. 1091. Thereupon the Interstate Commerce Commission, pursuant to the request of these petitioners, amended its original order, and on October 30, 1912, entered the order which is now sought to be annulled. While the Commission adhered to the views theretofore expressed, it not only found as to each of the petitioners herein "that the tracks and equipment with respect to the industry of the several proprietary companies are plant facilities, and that the service performed therewith for the respective proprietary lumber companies in moving the product of the mills to the trunk lines is not a service of transportation by a common carrier railroad, but is a plant service by a plant facility, and that any allowance or divisions out of the rate on account thereof are unlawful and result in undue or unreasonable preferences and unjust discriminations, as found in said reports"; but in order to enable the petitioners herein to secure a judicial review of the legality of its action, it also expressly ordered the trunk line defendants "to cease and desist and for a period of two years hereafter, or until otherwise ordered, to abstain from making any such allowances to any of the above-named parties to the record in respect of any such above-described services."

While thus forbidding allowances and divisions in respect to services in moving the logs to and the lumber from the proprietary mills, the Commission further expressly ordered as to the tap lines that are petitioners in this court:

"That in case of the failure of the principal defendants (the trunk lines) to re-establish, on or before January 1, 1913, the through routes and joint rates in effect on April 30, 1912, on traffic other than the products of the mills of the respective proprietary companies the Commission will upon appropriate petition herein enter an order requiring the establishment of such through routes and joint rates or enter upon an inquiry with respect thereto."

The terms of the original order were followed in dismissing, among others, the complaint of the Mansfield Railway & Transportation Company in so far as it related to rates on products of the mill of the proprietary company. The amended order, however, instead of merely authorizing, now directed the trunk lines to re-establish through routes and joint rates with a number of tap lines not now before this court, provided that the rates from points on these lines should not exceed the junction point rates; and provided also that the divisions and allowances out of such joint rates on the products of the mills of their proprietary lumber companies should not exceed certain stated amounts.

The findings in the amended order differed from those in the original order by adding thereto the specific findings hereinabove set forth in reference to plant service, plant facilities, undue and unreasonable preferences, and unjust discrimination.

A careful consideration of the several reports and orders leads to the conclusion that the Commission held:

First. That each of the petitioning tap lines is a bona fide interstate common carrier.

Second. That in respect to the services rendered by them for the nonproprietary mills they acted in this capacity.

Third. That in respect to the services rendered by them for the proprietary companies they acted not in their capacity of common carriers but purely as a plant facility, and performed, not a transportation, but a plant service.

Fourth. That in respect to the services performed for their proprietary companies, each of the other tap lines with which the trunk lines were directed to re-establish joint rates, although under a limitation as to the amount of the division or allowance to be paid, not merely performed a transportation service, but also in so doing acted in its capacity of an interstate common carrier.

[1] The evidence before the Commission tending to show that the petitioning tap lines were originally constructed as mere plant facilities to serve only the proprietary interests, that the latter owned or through common ownership in whole or in large part controlled them, that the later incorporation was primarily in order to secure rebates, that the incorporation of only a part of the logging road was a device to retain a monopoly, that the traffic other than that of the proprietary mills was negligible in quantity and merely incidental, that the trunk lines and their branches could be compelled to render such service and at such rates as would make it unnecessary to employ the tap lines as common carriers, as well as the evidence of many other facts on which the Commission in its report and counsel in argument and briefs lay much stress, might have justified the Commission in finding that these tap lines were not in fact bona fide common carriers. We do not, however, consider this question as open, because, in our judgment, the Commission impliedly, if not expressly, held them to be interstate common carriers when it authorized and in effect directed the re-establishment of through routes and joint rates as to the nonproprietary traffic, inasmuch as the Commission is without authority to make such an order except as between interstate common carriers.

For the same and similar reasons we say that the Commission necessarily deemed the services rendered for proprietary companies by those tap lines not now before us with which the trunk lines were ordered to re-establish joint rates as to all traffic, to be not merely transportation services rendered by or on behalf of the proprietary companies for which, under section 15 of the act, an allowance may be made, but transportation services rendered by the tap lines as interstate common carriers. Under the act a carrier may perform accessorial, nontransportation services for a shipper, provided this be done without unjust discrimination. It cannot, however, be compelled so to do. It must therefore follow that, in the judgment of the Commission, the services which it compels a carrier to perform are necessarily transportation services. Moreover, while under section 15 a carrier may permit a shipper, directly or indirectly, to render a service connected with transportation, and may make a just and

reasonable allowance therefor, it cannot be compelled to permit such substituted performance of any of its own obligations. It follows therefore that when the Commission, instead of merely fixing a maximum allowance to be paid to the tap lines or to the proprietary companies for switching and other services rendered with the consent of the trunk line in connection with through shipments directs the establishment by the trunk lines of joint rates with such tap lines, and the payment of not exceeding a specified division out of such joint rate for such services, it necessarily holds such services to be not merely services connected with transportation but the services of an interstate common carrier engaged in such transportation.

[2] That a common carrier may, however, as to some of its work, act in a strictly private capacity, is well settled (S. F. P. & P. Ry. v. Grant Bros., 228 U. S. 177, 33 Sup. Ct. 474, 57 L. Ed. 787); and that it may as to certain shippers, and particularly as to a proprietary company, be a mere plant facility and perform merely plant or industrial services as distinguished from transportation services, has been held by this court in Crane Iron Works v. U. S., No. 55, June 7, 1912, 209 Fed. 238.

Whether or not a payment provided for in the tariff for such a service would be per se illegal in the absence of an order by the Commission forbidding it (C. & A. Ry. v. U. S., 156 Fed. 558; Am. S. R. Co. v. D., L. & W. Ry. [C. C. A.] 207 Fed. 733, reversing s. c. [D. C.] 200 Fed. 652), it is clearly within the power of the Commission to prohibit such payment (Am. S..R. Co. v. D., L. & W. Ry., supra).

If, then, the Commission was justified in finding that these interstate common carriers, the petitioning tap lines, were mere plant facilities as to their proprietary companies, and that the services rendered by them in hauling logs to and lumber from the proprietary mills were merely the plant services of plant facilities, its order forbidding any division or allowance therefor would be valid and proper.

[3] Whether or not this is a justifiable finding of fact is to be determined, in the first instance, by the Interstate Commerce Commission. When, as in these cases, a full and fair hearing has been granted, the Commission's findings of fact are subject to review in this court only upon an allegation that they are not sustained by any substantial evidence in the record before it or are arbitrary in being based upon improper distinctions and considerations.

No constitutional question can properly be involved in such a case, inasmuch as the tap lines, if they are in fact acting only as plant facilities in respect to the proprietary companies, can have no constitutional right to that which is necessarily an illegal allowance, however much they may be injured financially by the denial thereof.

[4] Nor can the Commission be charged with such arbitrary action, as would justify an annulment of its orders in respect to the petitioning tap lines merely because of a different finding as to some other tap lines, whose history, physical conditions, and relations to and service for the proprietary companies are in many respects like, although necessarily not identical with, those of the petitioning tap

lines and their proprietary companies; for, though the orders are made in one proceeding, they are separate and distinct as to each of the tap lines, and are expressly based upon a careful investigation of and separate findings in relation to each of the companies. Moreover, an erroneous conclusion by the Commission as to the real nature of the services of one or more of the tap lines toward its or their proprietary companies would of itself be no justification for the annulment of the findings and the orders as to some other companies on the ground of arbitrary action, if the latter are based upon substantial evidence. Arbitrary action can, however, be predicated on a disregard by the Commission of the very criteria which it adopts to determine the ultimate questions of fact, or on the adoption of distinctions without real differences.

The important questions, therefore, to be considered by this court are:

First. Whether the Commission acted arbitrarily and on improper considerations in determining under what circumstances a common carrier tap line would be deemed to be acting as a mere plant facility of and performing mere plant service for the proprietary companies. Or,

Second. Whether in each of these cases there was substantial evidence to justify the ultimate findings and the consequent order of the Commission; not whether this court would have drawn the same conclusion from conflicting evidence; not whether, in the judgment of this court, it is expedient or inexpedient to encourage the building of these tap lines by the large lumber interests of the southwest, but solely whether in the evidence before it there can be found a substantial basis for the Commission's conclusions.

Before determining these questions, there are some subsidiary matters which require attention.

[5] 1. It is urged upon us that the petitions herein should be dismissed on the ground either that, though affirmative in form, they are nevertheless negative in substance, or that the petitioners in this court are not those against whom the order is directed. This motion must be denied. The amended order is clearly an affirmative order. It expressly forbids certain action because of its illegality. Disobedience would involve not merely the penalties prescribed by the act for illegal transactions, but the other and heavier penalties therein prescribed for violation of the orders of the Commission.

Inasmuch as the petitioners herein, though not the parties commanded in the order to desist from the illegal action, are directly and financially affected by the orders in question, they have a standing as complainants in a court of equity. I. C. C. v. Diffenbaugh, 222 U. S. 42, 32 Sup. Ct. 22, 56 L. Ed. 83.

[6] 2. The petitioners in cases Nos. 90 and 91 seek not only to have the order of the Commission annulled, but pray also that the trunk lines may be ordered to perform certain contracts made with them. As this court is without jurisdiction to enforce such contracts, this additional prayer may be disregarded. Neither joining a cause of action over which this court has no jurisdiction with one over

which the court has jurisdiction nor the joining of unnecessary parties defendant would, however, justify the dismissal of the petitions.

[7] 3. The Interstate Commerce Commission has moved to strike out the testimony taken by this court on the ground that the only real' issues in the case, viz., whether or not there was substantial evidence before the Commission to support its order, and whether or not it acted arbitrarily, not in the sense of denying a full and complete hearing, but in the sense of acting in utter disregard of the evidence or upon distinctions not based upon the evidence, must be determined exclusively by the record as made before the Commission. In our judgment this motion must be granted.

Under the law as it existed prior to the amendment of 1906, the findings of the Commission on the facts were expressly given only prima facie effect. For this reason the courts, while stating that the carriers ought not to withhold evidence from the Commission and for the first time produce it before the court, nevertheless held that neither party was restricted in the courts to the evidence before the Commission on the question of reasonable rates, unjust discriminations, or dissimilarity' of circumstances. C., N. O. & T. P. Ry. v. I. C. C., 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935; I. C. C. v. Alabama Midland Ry. Co., 168 U. S. 144, 18 Sup. Ct. 45, 42 L. Ed. 414.

Under the amendment of 1906, however, the determination of the Commission as to the facts is final and binding, subject to the qualification that it must be supported, not by a mere scintilla of proof, but by substantial evidence. I. C. C. v. Union Pacific R. R., 222 U. S. 541, 548, 550, 32 Sup. Ct. 108, 56 L. Ed. 308. Whatever may be the rule as to the admission of additional evidence when an order of the Commission is attacked as making a rate that is confiscatory, we are of the opinion that when, as in these cases, the real basis of the complaint is that the findings of the Commission are unsupported by substantial evidence or are arbitrary, as based upon distinctions shown by the evidence to be improper, the correctness of such allegations can be tested only by the evidence that was before the Commission.

If, after the hearing by the Commission and either before or after its order shall have been entered, new evidence should be discovered, or a change should have taken place such as should cause the Commission to modify or reverse its findings and order, the proper remedy is to apply for a rehearing, to present a supplemental complaint, or to file a new complaint before the Commission. Any and all evidence bearing upon the questions of fact involved in the matters adjudicated should, however, first come before the Commission in order that it may be able to determine the ultimate facts in the case.

We come, then, to a consideration of the main questions: Was there, as to each of these petitioning tap lines, substantial evidence to justify the findings of the Commission? Did the Commission differentiate the several companies arbitrarily on distinctions or differences not justifiable in law? While evidence was given as to each road separately and specifically, and while the report deals with each road separately, a considerable mass of testimony and a considerable por-

tion of the reports cover the entire situation. It is apparent therefrom that very real evils existed, evils demanding correction.

Tap lines, in many instances, were receiving amounts entirely disproportionate to the services rendered by them; amounts based, not upon the cost or the value of the services rendered, if they were transportation services, but upon other and totally illegal considerations. Such payments were, in a large measure at least, secret rebates, and to that extent unlawful. Many tap lines received no allowances for work practically identical with that performed by other lines to which most liberal allowances were given. Moreover, while prior to 1906 divisions and allowances, especially in the form of secret rebates, were made directly to the mills, after the amendment of 1906 the test of the right to receive them, as fixed by the trunk lines, was incorporation of the tap line as a common carrier, although it is clear that incorporation is not essential to the status of an interstate common carrier.

The power of the Commission to prevent such rebates and unjust discriminations is beyond question. It is to be accomplished, however, not by enjoining payments, which the law itself recognizes as legal, but by requiring equality of treatment and by regulating the sums to be paid, so that they will be fairly proportioned to the services rendered. That the Commission is not authorized to forbid lawful payments merely because, in its judgment, unjust discriminations result therefrom, or to declare that to be unjust discrimination which results only from a perfectly lawful payment, is apparent from the case of I. C. C. v. Diffenbaugh, 222 U. S. 42, 32 Sup. Ct. 22, 56 L. Ed. 83. The invalidity of the Commission's finding, when unsupported by the evidence, that certain services are plant facility and not transportation services, is also attested by the same case.

In the Diffenbaugh Case the Commission held that on grain passing through an elevator and mixed, treated, weighed, or inspected therein, no allowance for elevation might be made to the elevator owner if he had any interest in the grain itself. The basis of the order was its determination that the elevation under such circumstances was not transportation within the act, and that an unjust discrimination resulted in favor of the elevator owner, against other grain dealers who did not have elevators, even though the payment was an honest one, limited to the bare cost of elevation, inasmuch as he obtained undue advantages by being thereby enabled to perform other services in respect to the grain. But the courts held that unjust discrimination could not be based upon a lawful and proper payment and that such a service was in fact a transportation service. Mr. Justice Holmes says (222 U. S. 46, 32 Sup. Ct. 24, 56 L. Ed. 83):

"The act of Congress in terms contemplates that, if the carrier receives services from an owner of property transported, * * * he shall pay for them."
"The only permissive element being that the Commission may determine the maximum" to be paid. ·

Judge Sanborn, writing the opinion of the Circuit Court en banc, said (176 Fed. 409, 418):

"Reasonable compensation for transfer services may not be denied lawfully because there is a possibility that those who receive it may at some future

time violate the law and secure rebates or effect discrimination. There is no more power in the Commission to forbid carriers from paying or allowing for the elevation and transfer of grain in transit reasonable compensation because there is a possibility that a future violation of the law may arise out of such an allowance than there is to prohibit carriers from charging and receiving reasonable rates for transportation of all property, because there would be less danger of future rebates and discriminations if they were compelled to conduct transportation without compensation."

[8] Equally may it be said that a reasonable division out of joint rates cannot be denied a common carrier for transportation services because of any past or present derelictions, or even the fear of further violations of the law. The law itself fixes the method of punishment for such wrongs; it does not include therein a denial of proper compensation for proper services.

Common ownership of a railroad and an industry facilitates the making of discriminations and the covering up of rebates. For this reason Congress enacted the commodities clause, which forbids a railroad from transporting any commodity "manufactured, mined, or produced by it or under its authority, or which it may own in whole or in part or in which it may have an interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier."

But Congress at the same time expressly excepts "timber and the manufactured products thereof" from this prohibition. It has thereby made it manifest that, in its judgment, the possible evils of secret rebates and unjust discriminations which might result from the common ownership of a railroad and a lumber plant do not offset the advantages that may be derived therefrom. It is clear, too, as well from the report and the evidence before the Commission, particularly the concurring opinion of Mr. Commissioner Prouty, as from the position taken by the state of Louisiana in this court in support of the contentions of these petitioners that these advantages are very real; that the vast forests of the country will not be developed without branch or tap lines running from the great trunk lines into the woods themselves, near which sawmills are most advantageously to be located; and that in a large measure the capital for the construction of such branch or tap lines must be raised by those who control the forests and the mills.

[9] Common ownership or control of a lumber mill and a railroad cannot, therefore, be prohibited by the Commission or be made the basis of a denial to a railroad of rights accorded another road not so owned.

Counsel for petitioners strenuously urge that this is the real basis for the action of the Commission in classifying many of these tap lines. Despite some expressions in the report which would seem to support this conclusion, we accept the Commission's express recognition of this limitation of its power and its disclaimer both in this and in later cases (see McCloud Lumber Co. v. S. P. Co., 24 Interst. Com. Com'n R. 89, 94) of the adoption of this test.

What, if any, general rules did the Commission formulate? While it is stated at page 293 of the report (23 Interst. Com. Com'n R.):

"That the question is not susceptible of solution on general grounds; * * * that the only safe course is to ascertain and determine on the facts disclosed in each case what is the real relation between the tap-line and the (proprietary) industry"

—the Commission, nevertheless, further says:

"It is apparently the practice of the trunk lines, where no allowance is made, to set the empty car at the mill and to receive the loaded car at the same point. Indeed, they do this in many cases even when an allowance is made to the tap line. But whenever this service is performed by the trunk line, it is included in the lumber rate and is done without additional charge.' * * * By their common practice the public carriers interpret the lumber rate as applying from mills in this territory apparently as far as three miles from their own lines. * * * The transportation (in such case) commences at the mill. If therefore a lumber company, having a mill within that distance of a trunk line, undertakes, by arrangement with the trunk line, to use its own power to set the empty car at the mill and to deliver it when loaded to the trunk line, it is doing for itself what the trunk line, under its tariffs, offers to do under the rate. In such a case the lumber company may therefore fairly be said to furnish a facility of transportation for which it may reasonably be compensated under section 15, whether its tap line is incorporated or unincorporated. * * * It is not lawful when the lumber company refuses to permit the trunk line to do the work. No allowance, however, ought to be made by a trunk line to a lumber company where the mill is within, say, 1,000 feet of the trunk line. We should regard an allowance under such circumstances as a mere device to effect an unlawful payment to the lumber company. We should take the same view of an allowance where a short switch track to the mill has been torn out or is still available but not used in order to give the appearance of a longer haul to the mill over a spur or switch track constructed by the lumber company or by its tap line.

"Where a mill is distant more than three miles from a trunk line and is connected with the latter by a tap line not recognized by this Commission as a common carrier in respect of the service performed for its proprietary lumber company, no allowance or division, may lawfully be made by a trunk line either to the lumber company or to its tap line. Such a lumber company, although using rails, stands in no better position under the law with respect to its lumber than does a lumber company that uses other means of delivering its lumber to a public carrier. But where a mill is more than three miles distant from a trunk line and is connected with it by a tap line organized as a common carrier and so recognized by this Commission, the mill is to be regarded as a shipping point equally with all other mill points in the extensive rate group which the trunk line carriers have defined in this territory; and the lumber rate is to be regarded as in effect from the mill, the tap line being entitled to a division thereof. * * * "

In a concurring opinion, Prouty, C., however, said (23 Interst. Com. Com'n R. 344):

"I do not fully concur in the suggestion that main-line carriers may make to the owners of private railroads not common carriers allowances for the movement of lumber from the mill to the main line. I doubt whether this is a transportation service within the meaning of section 15."

In effect the Commission holds:

First. Switching service within three miles of a trunk line is by custom included in the through rate.

Second. Such switching is a transportation service.

Third. For switching products of a proprietary mill located within the three-mile limit, no division of the through rate may be made,

but an allowance, under section 15, may be paid either to the industry or to its tap line, if the trunk line prefers to permit the industry or tap line to do this work.

Fourth. For switching products of a nonproprietary mill an allowance may be given, and, in the case of a common carrier tap line, a division out of the through rate should be made.

Fifth. But no such allowance or division shall be made if the proper switching distance is or should be less than 1,000 feet.

Sixth. The benefit of the blanket rate is to be extended beyond the three-mile switching limit for a mill on or connected by switch (presumably not over three miles long) with a common carrier tap line and through the latter with a trunk line, provided only that the mill be not a proprietary industry as to the tap line. Neither allowance nor division is to be given, the tap line for switching the products of such a proprietary mill.

[10] In our judgment these distinctions must be regarded as arbitrary and without justification as a matter of law. In determining the proper boundaries of free switching or blanket-rate service, the Commission could, of course, take into consideration, or even be guided by the practice of the roads as to the distances within which switching should be free.

In view of its finding as to the custom, it could have limited the blanket rate to mills within three miles of a trunk line. This, however, it did not do. On the contrary, it expressly ordered that the blanket rate be extended to mills on (or probably within three miles of) a common carrier tap line that connected with a trunk line, irrespective of the distance of the mills from the trunk line, provided only that they were nonproprietary. The alleged custom was thereby disregarded.

Moreover, a custom relating to the territorial extent of a blanket rate cannot, in the nature of things, be determinative of the character of the service. If switching from 1,000 feet to three miles from a proprietary mill to a trunk line by means of a tap line is a transportation service, as the Commission (Prouty, C., doubting), in our judgment, correctly held, then switching for a longer or a shorter distance under similar conditions cannot be a plant service. The distinction between transportation and plant service cannot be dependent upon the distance that the goods are moved.

Inasmuch as the reports are specifically made a part of the order, and as the Commission therein expressly permits payment of an allowance to a proprietary mill located within the three-mile limit (23 Interst. Com. Com'r R. 603, Victoria, Fisher & Western R. R., No. 93), we do not interpret the finding in the original and amended orders that the service for the proprietary companies is a plant service and an allowance therefor illegal as intended to apply to a switching service from 1,000 feet to three miles. As we have already stated, the possibility, particularly in the case of short switches, of an abuse or illegal use by a railroad of the right granted to it by statute to make an allowance for services connected with transportation which, in its discretion, it permits the shipper to perform, does not

vest the Commission with power absolutely to forbid its exercise as an unjust discrimination. It may cut down the compensation if it be too high; it may enforce any reasonable regulations to prevent unjust discrimination, but it may not forbid such payments as unlawful because the service is relatively either small or great.

Nor may the line be drawn on the basis of what is and what is not essential to the industry. Transportation would not flourish without manufacturing; manufacturing could not be successfully carried on without transportation; they are distinct activities; but both are essential to the industry. Raw materials must be brought to and the finished product must be carried from the mill; whether any particular service involving an actual hauling of the goods is transportation or industrial depends upon whether, on the one hand, it is an interindustry act, a step in the manufacturing process, or, on the other hand, a movement of raw material from without to the mill or of finished product from the mill toward the market. Every actual carrying of each part of the material or product is, of course, not a transportation service. The Crane Iron Works Case, supra, well illustrates this. In that case, as in other cases therein cited (General Electric Co. v. N. Y. C. & H. R. R. R. Co., 14 Interst. Com. Com'n R. 237; Solvay Process Co. v. D., L. & W. R. R. Co., 14 Interst. Com. Com'n R. 246), it was held that the hauling between buildings of an extensive plant was a part of the manufacturing, not of the transportation operations; that the transportation ended, as to raw materials, when the common carrier had performed all that it could have been required to perform and all that it did for nonproprietary mills, that is, when it made delivery at some point on the plant; that any further activity on the part of the tap line common carrier within the plant itself could not have been compelled and was not a transportation service for which the trunk line could pay either an allowance to the industry or a division of the joint rate to the tap line as a common carrier.

[11] But the situation here is totally different. The actual service in transporting logs to or lumber from the proprietary mills in no respect differs from that performed for independent mills; the carriage over the tap line ranges from a short switch to a many-mile haul; its purpose, so far as the lumber is concerned, is not to serve the industry in its internal operations, but directly to serve both the mill, as shipper, and the general consuming public, as consignees and purchasers. When these tap lines, which it must again be emphasized, are not private carriers, but are admittedly for some purposes interstate common carriers, take the car loads of finished lumber at the mills for the purpose of either hauling or switching them to a trunk line so that they may reach their ultimate destination beyond the state, the interstate transportation has actually begun.

As to the logs, the conditions, while not identical, are not dissimilar. The hauling, it is true, is primarily for the benefit of the mill; consignee and consignor are one. If the service had continued to be what it originally was in most of these cases, by a private carrier for the one industry alone or from the forests to the directly adjacent mills,

forest and mill being in fact one entire plant, so that the haul was inter-industrial, it might well be held to be a plant-facility service (Kaul Lumber Co. v. C. of G. Ry. Co., 20 Interst. Com. Com'n R. 450, 455); but as Prouty, C., says in that case:

"The thing done is properly the function of a common carrier and not neces-sarily of a plant facility. Great quantities of logs are transported to mills for manufacture by railroads as common carriers under published tariffs."

The Commission might have limited the blanket rate to the lumber either directly or by forbidding milling in transit. This, however, was not done. On the contrary, the order directing re-establishment of the old rates as to nonproprietary mills sanctioned the extension of the blanket rates not only to the mill, but back to the forests with the milling in transit privilege. That applied to each of the petitioning tap lines and is in itself a recognition of their status as interstate common carriers not only of lumber but also of logs.

Again, it is immaterial that in an early stage of the industry or in small plants logs are hauled to and lumber from the mills by horse and wagon and not by railroad. When this is the method of bringing the goods to the trunk line, the allowance may or should be forbidden, not because of the nature of the service—clearly it is transportation when performed by a common carrier expressman—but because of the means used to perform it. The allowance to be made by a trunk line under section 15, and the payment of which cannot be forbidden (I. C. C. v. Diffenbaugh, supra), is only for a service that is a part of or for an instrumentality to be used in the transportation which the trunk line would otherwise be compelled to perform, not for a service which is neither part of nor directly connected with the trunk line's transporta-tion, even though it be transportation in its relation to the industry.

The fact that these tap lines connect directly with the private logging roads of the proprietary mills, that the latter alone run into the forests, that the point at which the common-carrier service begins is more or less arbitrarily determined solely in the interest of the proprietary mills, that other mills must haul their logs by team to the tap line or must purchase them in the open market, and that thereby these proprietary mills have great commercial advantages over their competitors, does not in any manner affect the matters now before us. As the Supreme Court has said in the Diffenbaugh Case, supra:

"The law does not attempt to equalize fortune, opportunities, or abilities."

As the actual service rendered by the tap line from the time it takes the logs until it delivers the finished product to the trunk line is the same for proprietary and nonproprietary mills, and as this is held to be a transportation service by an interstate common carrier as to the latter, it must be held to be a similar service as to the former.

In view of our conclusions as to the arbitrary character of the dis-tinctions on which the order of the Commission is based, it becomes unnecessary for us to consider the evidence as to each petitioning tap line separately.

It follows, therefore, that the Commission was not only without power to forbid any allowance whatsoever to be made by a trunk line to the petitioning proprietary industries for switching either less than 1,000 feet or more than 3 miles, but it was also without power to prohibit the making of joint rates by the trunk lines and the petitioning tap lines and the payment by the former to the latter of some division thereof for its services in hauling logs to and lumber from the petitioning proprietary mills, and its order must to this extent and as to these petitioners be annulled.

The Commission is, of course, fully empowered to regulate the amount of allowances and divisions so as to prevent rebates and unjust discriminations. In this way, as well as by the prohibition of or prosecution for certain illegal practices mentioned in the report, whereby proprietary mills obtain undue advantages, most of the evils, which the Commission has sought by its order to prevent, will be checked. But such as are inherent in the common ownership of industrial and common carrier transportation facilities do not constitute legal wrongs and must remain unless and until Congress shall extend the scope of the commodities clause.

In so far as the order of the Commission is negative, in dismissing the complaint filed to secure an order compelling the re-establishment of through routes and joint rates, we are without jurisdiction to determine its validity.

A decree will be entered in accordance with the views herein expressed, and it is so ordered.