statute, and the statute expressly provides that, in the event that the party to be examined is a female, she shall be entitled to have such examination before physicians or surgeons of her own sex, and this rule is not limited to adult females but applies to all females. The order here under consideration simply directs a particular physician, a man, to take an X-ray picture of the plaintiff's right foot, though it appears from the record that the physician is not an X-ray operator, and the order itself seems to contemplate that it shall be actually taken by some other person, for it is to be done under the direction of this physician, who is not authorized under the rules of practice to act as a referee (rule 79, General Rules of Practice), and who has, according to the language of the order, "already made a physical examination of the infant plaintiff for and on behalf of the defendant."

We are unable to discover that the fact that the plaintiff has had an X-ray picture taken of the right foot has anything to do with the question of the rights of the defendant; she has the burden of proving her case by a fair preponderance of evidence. She is bound to show the injury to her foot, and she has the right to introduce any competent evidence of the injury, but that does not give the defendant a right to go farther in a personal examination of the plaintiff than the statute clearly provides, and it must be assumed that when the plaintiff was examined, by consent, in May, the examination went as far as the defendant was entitled to go. Having completed that examination, and the party who made the same being still alive, no good reason suggests itself why the female plaintiff should be called upon to appear before the defendant's physician, not for examination, but for the purpose of taking a picture which he may examine.

There is no inherent right in the court to compel a physical examination of a plaintiff. Without the statute there would be no such right, and the fact that the plaintiff is an infant does not enlarge the powers of the court nor permit it to overlook the rules under which the right is given.

The order appealed from should be reversed, with costs. All concur, except KELLOGG and HOWARD, JJ., dissenting.

---

(83 Misc. Rep. 529)

NEW YORK CENT. & H. R. R. CO. v. GENERAL ELECTRIC CO.

(Supreme Court, Trial Term, Schenectady County. January, 1914.)

1. CARRIERS (§ 35*)—DISCRIMINATION—CONTRACT TO PAY SHIPPER FOR SERVICES—VALIDITY.

A carrier's contract to pay a shipper 20 cents per ton for "spotting" cars on the shipper's tracks in its own yards, being a contract for services constituting no part of the transportation and not part of the service covered by the lawful published freight rate, was in effect a contract to pay an unlawful rebate, and hence invalid under the Act to Regulate Commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]).

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 94; Dec. Dig. § 35.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. CARRIERS (§ 30*) — DISCRIMINATION IN SHIPMENT CHARGES — TERMINAL CHARGES—PUBLICATION.

Under Act to Regulate Commerce (Act Feb. 4, 1887, c. 104, § 6, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]), as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1292), providing that terminal charges shall be stated in the published schedules, a shipper's charge against a carrier for "spotting" cars on the shipper's tracks in its own yards could not be collected as a terminal charge, where it had never been published as· such.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 81; Dec. Dig. § 30.*]

3. CARRIERS (§ 30*) — DISCRIMINATION IN SHIPMENT CHARGES — "TERMINAL CHARGES."

As used in the Act to Regulate Commerce (Act Feb. 4, 1887, c. 104, § 6, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]), as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1292), providing that the published schedules shall state separately all "terminal charges," the words quoted mean a separate rate for a service at a terminal, not always rendered in transportation from place to place, for a privilege or facility not furnished to all shippers.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 81; Dec. Dig. § 30.*]

4. CARRIERS (§ 32*) — DISCRIMINATION IN SHIPMENT CHARGES — "CONNECTED WITH."

As used in the Act to Regulate Commerce (Act Feb. 4, 1887, c. 104, § 15, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), as amended by Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1911, p. 1301), providing that a shipper rendering service "connected with" the transportation may be paid therefor by the carrier, the phrase quoted is a synonym of "a part of it"; it does not mean something in addition to transportation that touches or is attached to transportation.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*

For other definitions, see Words and Phrases, vol. 2, pp. 1434; vol. 8, p. 7612.]

5. RAILROADS (§ 216*)—PRIVATE SIDING—RIGHT TO DISCONTINUE.

A contract under which a private siding has been connected with the main line of a railroad, no time being fixed for its continuance, will not be permanently enforced, but is terminable at the carrier's election when the safety or the welfare of the public demands.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § ·713; Dec. Dig. § 216.*]

6. JUDGMENT (§ 641*)—DECISION OF INTERSTATE COMMERCE COMMISSION—CONCLUSIVENESS.

Where a carrier refused to comply with its contract to pay a shipper 20 cents per ton for "spotting" cars on the shipper's tracks in its own yard, and the shipper filed complaint with the Interstate Commerce Commission under Act to Regulate Commerce (Act Feb. 4, 1887, c. 104, § 15, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), as amended by Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1911, p. 1301), authorizing the Commission to fix charges to be paid by a carrier for services rendered, which complaint the carrier answered, the Commission's decision against the shipper, not having been reviewed or modified, was conclusive in a subsequent action by the carrier against the shipper wherein the shipper set up a counterclaim for services in "spotting" cars.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1155; Dec. Dig. § 641.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes·

Action by the New York Central & Hudson River Railroad Company against the General Electric Company, for balance due for freight. Judgment for plaintiff.

Lewis E. Carr, of Albany, for plaintiff.

R. D. Moot, of Schenectady (Adelbert Moot, of Buffalo, of counsel), for defendant.

VAN KIRK, J. This action is brought to recover from defendant a balance of $618.53 due for freight. This cause of action is admitted. The defendant sets forth a counterclaim to recover 20 cents per ton under a contract made in 1894, modified in 1903, by which it was in substance agreed that the plaintiff should pay to the defendant 20 cents per ton upon all in and out freight (certain commodities excepted) for services rendered by it in "spotting" cars on its tracks in its yards, which services defendant claims are a part of the transportation service covered by the published freight rates. The sole issue is upon this counterclaim.

There is no dispute as to the facts of the case. The facts are stated in the findings. An outline of these facts is set forth in General Electric Co. v. New York Central & Hudson River R. R. Co., 14 Interst. Com. Com'n R. 239. I shall make but a brief reference to the facts. In 1886 the business now belonging to the defendant was moved to Schenectady and used about eleven acres of land and two factory buildings. For a time thereafter freights less than car load lots were delivered at the plaintiff's freight house and carted to and from the defendant's plant; later ferry cars were used for such freight. The Delaware & Hudson Company had a switch track running into the yard and car load freights were delivered over this track to the two said buildings. Freights coming over this plaintiff's line were delivered through the Delaware & Hudson Company. In 1891 the defendant purchased a switching locomotive. With this was done part of the work in moving freight in and out without compensation. In 1894 the contract on which this counterclaim is based was made, and the parties acted thereunder until 1906, during which time defendant moved all the cars in its yards to and from the "storage and delivery tracks." In 1900 this defendant purchased other locomotives, and from time to time its plant has been extended until to-day within its fenced yard it includes about 150 acres of land and many buildings, and has constructed and is using about 12 miles of standard gauge track and 7 miles of narrow gauge track. These tracks make a network throughout the plant and yard, and over them the defendant, not only transfers materials and partly manufactured products from shop to shop, but also conveys the car loads of in and out freight to and from the storage and delivery tracks. The present practice is briefly as follows: Within the yard of the defendant and adjoining the lands and tracks of the plaintiff, the defendant has constructed and owns "storage and delivery tracks," so called. The plaintiff makes up in its yards a train of in-going freight and delivers this train upon those storage and delivery tracks. It also takes from the storage and delivery tracks such cars, loaded or empty, as are to be taken out. The

defendant company receives the cars upon the storage and delivery tracks, breaks the seals to inspect or determine the character of the freight contained in a car, marks upon the cars its destination in the yard, then takes, with its own motors, the car to the scales for weighing, and then to the shop or platform for unloading. Being unloaded, the car, if suitable for outgoing freight, is placed for reloading, or to await reloading. Being reloaded, or being a car which is not suited for any out-going freight, the car is taken again to the scales, weighed, and returned to the storage and delivery tracks. The defendant claims that it is entitled from plaintiff to one movement, in and out (to the unloading and from the loading platforms), in addition to the placing of the cars upon, and taking them from, these storage and delivery tracks; that the defendant performs this movement with its own motors, and the 20 cents per ton is in payment for that service; that the same is a reasonable charge therefor. It urges that the plaintiff spots cars for other patrons and that it is entitled to have cars spotted for it (meaning said one movement in and out). Under the contract and for such service, from 1894 to 1906, the plaintiff has paid to the defendant many thousands of dollars. There are of in and out freight, at the present time, about 100 cars per day each.

In or about 1906 this plaintiff and the Delaware & Hudson Company were indicted in the federal courts for having made such payments, which it was alleged were unlawful rebates. At each of the two or three trials of the indictments the juries disagreed. The indictments are now dismissed. The defendant has continued to perform the services, but since the indictment the plaintiff has refused to make payments under the said contract until such time as it should be determined that it could lawfully do so.

The contract is valid between the parties and at common law. Root v. Long Island R. R. Co., 114 N. Y. 300, 21 N. E. 403, 4 L. R. A. 331, 11 Am. St. Rep. 643. Whether or not terminable at the will of one party, it has not been terminated, and the plaintiff is apparently ready to perform, provided it may lawfully do so. The defendant has continued to perform and is entitled to recover on its counterclaim, unless the contract is in violation of the statute.

[1] The Act to Regulate Commerce, § 2, is as follows:

"That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, draw-back, or other device, charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

"Sec. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatever, or to subject any particular person, company, firm, or corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

Again, from section 6:

"No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs; provided, that wherever the word 'carrier' occurs in this act it shall be held to mean 'common carrier.' "

. If plaintiff, by or under said contract, (1) demands or receives a less compensation for service rendered to defendant than it demands or receives from another shipper for a like contemporaneous service in transporting a like kind of traffic, or (2) gives to defendant any undue preference or advantage, or (3) subjects another shipper to any undue prejudice or disadvantage, or (4) transports property of defendant without having published the rate and charge therefor in accordance with the act, or (5) demands or receives a less or different compensation for such transportation or any service connected therewith than is covered in the published rate or charge, or (6) in any manner refunds to defendant any portion of the published rate, or (7) extends to defendant any privilege or facility in transporting property not specified in its published tariffs (unless in payment for a service rendered connected with such transportation, or an instrumentality furnished therein by defendant [section 15]), then the contract offends against this act and is illegal.

The "twenty cents per ton" paid to the General Electric Company has never been published as a "terminal charge," or in any manner except in the through rate, nor has the privilege or fact been published in any tariff.

[2, 3] We may exclude all question as to terminal charges, because no charge in question is a terminal charge. Section 6 of the Act to Regulate Commerce contains the following:

"The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed and any rules or regulations which in anywise change, affect or determine any part of the aggregate of such aforesaid rates, fares and charges, or the value of the service rendered to the passenger, shipper or consignee. Such schedules shall be printed in large type and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation and facilities defined in this act."

The terminal charge is a separate rate, to be stated "separately," for a service at a terminal, not always rendered in transportation from

place to place, for a privilege or facility not furnished to all shippers. If the charge here sought to be collected were a terminal charge, it could not be collected because never published (Chicago & Alton R. R. Co. v. Kirby, 225 U. S. 155, 165, 32 Sup. Ct. 648, 56 L. Ed. 1033), and the shipper is as positively prohibited from receiving as the carrier is from paying it. In said section 6 is the following:

"And it shall be unlawful for any person, persons or corporation to offer, grant, or give, or to solicit, accept or receive any rebate, concession or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said Act to Regulate Commerce and the acts amendatory thereof, whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said Act to Regulate Commerce and the acts amendatory thereof, or whereby any other advantage is given or discrimination is practiced."

[4] The 20 cents per ton sought to be recovered is a part of the published through rate paid for the transportation service. I understand that the defendant urges that the wording of section 15, "If the owner of property transported under this act directly or indirectly renders any service connected with such transportation or furnishes any instrumentality used therein," etc., includes this service in question; that the service for which the owner may receive compensation from the carrier under this provision need not be a part of the transportation itself; but only connected with it. I conclude, however, that the expression "connected with" is a synonym of "a part of"; it does not mean something, in addition to transportation, that touches, or is attached to, transportation. A common carrier of property cannot include in its charge for transportation an item which is not a part of transportation, and it was not intended by said provision to require the carrier to pay for a service which it was not bound as a carrier of property to render and for which it could not charge. The railroad company owns a right of way, but it is held under a duty to transport for hire, to serve the public. It is a highway dedicated to a public use and may be acquired by condemnation. The carrier may charge for the services it renders over its right of way within the purposes of its franchise; that is, for transportation. Int. Com. Comm. v. D., etc., R. Co., 167 U. S. 643, 644, 646, 17 Sup. Ct. 986, 42 L. Ed. 306. Also under the act it may make such charges only as are contained in its published tariffs. Unless, therefore, the 20 cents per ton has been paid to plaintiff as a part of the through published rate, it cannot be repaid without violating the provisions of this act, the great purpose of which "was to secure equality of rates as to all and to destroy favoritism; these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences and all other forms of undue discrimination." New York, New Haven R. R. v. Int. Com. Comm., 200 U. S. 361, 391, 392, 26 Sup. Ct. 272, 277 (50 L. Ed. 515). I not only find nothing in section 1 to induce a different conclusion, but much to uphold it. After this section states, among other things, that the term "railroad" includes all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement, or lease, and shall also include all

switches, spurs, tracks, and terminal facilities of every kind used or necessary in the transportation of the person or property designated, and that the term "transportation" shall include cars and other vehicles and all instrumentalities and facilities for shipment or carriage irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, etc., it adds:

"And it shall be the duty of every carrier, subject to the provisions of this act, to provide and furnish such transportation upon reasonable request therefor and to establish through rates and just and reasonable rates applicable thereto."

As broad as these terms seem to be, they are limited in their application to the common carrier and to those things within the power.of the common carrier to provide and furnish; they are limited therefore to the common carrier's property (either owned by it or operated under a contract or lease) and its use. The "switches, spurs, tracks, and terminal facilities" must be upon its lands and do not include a private siding. The railroad, the carrier, cannot provide a private siding; it cannot procure one by condemnation, and it is not required to, by federal or state statute, nor can it provide and furnish services upon a private siding. The private siding and its use are entirely within the control of the private owner. The statute will not be construed to require a carrier to do that which it cannot do against the wish of the owner. By simple declaration the statute cannot give to the carrier private property or its use. The conclusion follows that transportation must be provided and furnished upon the property held by it for a public use or owned or operated by the carrier. For these and other reasons stated hereafter I cannot accept the argument of the defendant briefly stated as follows: Transportation includes delivery at an unloading point, as well as unloading. The unloading point must be the place where there are facilities for unloading. The only place where there are such facilities is at the platform where hoists and derricks furnished by defendant are available. That place is in its property, at its several buildings; and the defendant concludes that transportation by plaintiff includes delivery of cars at the several unloading points on plaintiff's property.

We may therefore consider that the 20 cents per ton is a payment back or rebate from the regular rate, and consequently, unless a reasonable charge for a part of the service rendered or an instrumentality, is in violation of said act. The charge here is not for the use of an instrumentality furnished by the defendant. I find that the 20 cents per ton is a reasonable charge for the work done and for which payment is claimed. The vital question, therefore, is whether or not this service is a part of the regular transportation service covered by the lawful, published freight rate. Is it a part of the service which the plaintiff is obliged to render as a common carrier of in and out freight? Is it service before delivery to the consignee and after acceptance from the consignor? If it is, the defendant's claim is lawful; if it is not, it is unlawful. Int. Com. Comm. v. Diffenbaugh, 222 U. S. 42, 32 Sup. Ct. 22, 56 L. Ed. 83. In order to answer this question, it is necessary

to determine where transportation begins and ends, where the delivering and receiving point is; in this case particularly whether or not transportation includes service over the defendant's private siding in its yard, beyond the storage and delivery tracks.

When transportation was by stagecoach, the place of delivery was to the consignee at a residence or business place reached by a street or highway. When by water, it was at a dock or wharf on navigable waters. Now that it is by rail, it must be a point reached by rail; and, as the rate paid for water transportation did not include the transportation beyond the dock or wharf, so the rate for railroad transportation cannot include transportation beyond a point reached by a railroad. I. C. C. v. D., etc., R. Co., 167 U. S. 643, 644, 646, 17 Sup. Ct. 986, 42 L. Ed. 306. At common law the rule generally was that delivery be made directly to the consignee, but the facility or mode of transportation has ever determined the place of delivery with some exactness. Within the limit of tracks the railroad has voluntarily accommodated to the extent it could, and from the completed delivery at its own freight house, or a convenient place in its yard, or upon the tracks of another, it has placed cars on private side tracks at the consignee's mill or platform. Such service could not be compelled at common law, though permissible. Jones v. N. N. & M. V. Co., 65 Fed. 736, 13 C. C. A. 95.

[5] A contract, under which a private siding had been connected, no time being fixed for its continuance, will not be permanently enforced, but is terminable at the carrier's election, when the safety or welfare of the public demands. Texas & Pacific R. R. Co. v. Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385; Jones v. N. N. & M. V. Co., supra, 65 Fed. 741, 13 C. C. A. 95. This rule is in harmony with the statute. The private siding is a siding on private lands outside the common carrier's property. The shipper cannot compel the common carrier to make and maintain a private siding, though switch connection with a constructed private siding may be compelled. The Act to Regulate Commerce, § 1, provides: Any common carrier "shall construct, maintain and operate upon reasonable terms a switch connection with any such * * * private side track which may be constructed to connect with its railroad, where such connection is reasonably practicable," etc. The Public Service Commissions Law, § 27, provides:

"A railroad corporation, upon the application of any shipper tendering traffic for transportation, shall construct, maintain and operate upon reasonable terms a switch connection * * * within a private side track owned, operated or controlled by such shipper; and shall, upon the application of any shipper, provide upon its own property a side track and switch connection with its line of road, whenever such side track and switch connection in reasonably practicable, can be put in with safety and the business thereon is sufficient to justify the same." Laws 1907, c. 429.

The meaning of these two sections is substantially the same. There is no requirement that the common carrier shall carry freight over the private siding, nor any requirement that it shall construct any part of the track off its own lands. In the state statute the carrier is required to construct and operate a switch and a side track upon its own lands to connect with a private side track owned, operated, or controlled by said shipper. It seems to me there can be no inference from this that

the common carrier is required to convey freight over the private side track any more than it is required to carry freight over another common carrier's line with which it is compelled to make connection, but the inference is that it must receive freight from the private side track and deliver freight to it and upon it. The private siding, off the carrier's property, is not a part of the main line, nor the property of the carrier. It may be a convenience for the carrier in its service to other shippers; it may save the carrier expense for larger yards or additional tracks therein, or in simplifying its switching. But none of these considerations affect the question here. That it is voluntarily done from prudence does not render it enforceable as a right and may be prejudicial to others; that is, directly in conflict with the statute. It is a safe rule (and I find no decision to the contrary) to hold transportation begins and ends where the carrier's, or connecting carrier's, line begins and ends. So far as an enforceable right exists under a freight rate, why should not the right begin and end at the line or on the property of the carrier? Such rule has many advantages. It is definite; it avoids temptation to, and facility for, preferences and favoritism; under it all rates for one class of freight would be practically uniform for the same locality or rate "zone"; and it is consistent with the strict responsibility resting upon carriers to safely transport and deliver. Terminal, or extra, charges may perhaps be made and published for valuable services over a private side track, but every shipper from Schenectady, or from the zone in which a Schenectady rate prevails, would be upon the same footing for a shipment in and out of that zone, as far as the carrier is concerned. To require a carrier to spot cars off its own tracks and on private sidings must often result in unequal rates and privileges, or at least be a constant temptation thereto. I know of no reason why a shipper, who has a private siding, should be deprived of this advantage. The law does not attempt to equalize location, opportunity, or foresight. He may have his car freight delivered and received on that side track, which necessarily means that the carrier may be permitted to convey the cars some distance on or over the side track. But, because the carrier is permitted, in one movement, to convey the cars 500 feet on a private siding, it is not to be concluded that it must convey them ten miles on such siding. There must be a line drawn, and, under the statute, that line is "undue and unreasonable advantage," "equality of rates as to all." Where the movement is so short, or the service is of so little cost, that it does not add an appreciable amount to the cost of transportation, as furnished to all shippers under the published rate charged to all shippers, it may be performed, otherwise it may not be.

So if, as claimed, Schenectady rates now include something in addition to the proper charge for transportation to a Schenectady point, because the carrier in some cases does work in the shipper's yard, that "something in addition" should be cut from the said rate rather than paid back to the shipper. The plaintiff is not justified in putting into its published through Schenectady rate an item for service to defendant in defendant's yard. If it may lawfully charge (the charge being in its published tariff) defendant for such service, and if defendant

may pay for it, it cannot add to the charge to shippers generally something for service to this defendant. The general freight rate from point to point may not include an element for spotting (where it occasions appreciable expense), as such actually results in an unjust charge to those for whom spotting is not done. If the plaintiff's rate charged to defendant is 20 cents per ton more than the just rate to and from a Schenectady point, because it covers spotting, that 20 cents should be cut from the rate. The antirebate law can be better enforced if no such contract as here in question be allowed, except where the shipper does work or furnishes instrumentalities on the carrier's lines and property, and when it separately states the charge in its published tariffs. When this plaintiff has delivered cars on defendant's storage and delivery tracks in defendant's yard, it has made delivery off its own line in the Schenectady zone at a place convenient to defendant and selected by it. If it then pays 20 cents per ton to the defendant for a service in transporting beyond that place, it has realized 20 cents per ton less than it realizes from any other shipper in said zone, who receives his own freight at the freight house or yard or on a siding on plaintiff's lines used by shippers, and defendant has been given a preference. This is forbidden. Wight v. U. S., 167 U. S. 512, 517, 17 Sup. Ct. 822, 42 L. Ed. 258. Plaintiff must treat all shippers alike (Armour Packing Co. v. United States, 209 U. S. 72, 28 Sup. Ct. 428, 52 L. Ed. 681, cited in Chicago & Alton R. Co. v. Kirby, 225 U. S. 165, 32 Sup. Ct. 648, 56 L. Ed. 1033); it must charge the same rate to all and that the published rate (Id.). I find that the delivery on the storage tracks is a delivery to defendant; that the transportation begins and ends there; that plaintiff's published tariffs include no charge for service upon a "private siding"; that no transportation on a private siding further than to make clearance can be required from the carrier, though it may move cars thereon where the cost of such movement does not add appreciably to the cost of transportation as furnished to all shippers; that to perform the service here demanded by defendant, under the conditions disclosed in defendant's yard, would add substantially to the cost of transporting defendant's freight. The contract is illegal. This in substance is the holding of the Interstate Commerce Commission (14 Interst. Com. Com'n R. 361), and which it has never modified. Reference will now be made to some of the decisions most strongly urged by defendant.

In Int. Com. Comm. v. Diffenbaugh, 222 U. S. 42, 32 Sup. Ct. 22, 56 L. Ed. 83, the decision is confined to "grain in transit" from one carrier to another and to grain that had been "treated, weighed, inspected, or mixed," and it was held that payment for elevation and transferring of such grain so in transit may be allowed, even though the owner of the grain owned the elevator and reaped an advantage from the opportunity to treat, clean, clip, and mix the grain during elevation. The law does not attempt to equalize fortune and opportunity.

"If the carrier receives services from the owner of property transported, or uses instrumentalities furnished by the latter, he shall pay for them."

There is nothing to prevent a carrier from hiring an instrumentality used in transportation, if he does not own such. This case leaves the

question as to where transportation ends and where delivery is made entirely open. The decision specifically does not cover grain which "did not go on." 222 U. S. 48, 32 Sup. Ct. 22, 56 L. Ed. 83, and dissenting opinion of Mr. Justice McKenna, concurred in by Mr. Justice Hughes, 222 U. S. 50, 32 Sup. Ct. 22, 56 L. Ed. 83.

Authorities are cited to show that the carrier's contract covers the loading and unloading of freight. It has long been the rule that it was the carrier's duty to load and unload many kinds of freight. In London & L. F. I. Co. v. Rome, W. & O. R. R. Co., 144 N. Y. 200, 205, 39 N. E. 79 (43 Am. St. Rep. 752), the court said:

"There is no doubt that it is the duty, generally, of a railroad company to load the freight delivered to it for transportation into its cars. * * * But we know from our own observation that as to hay, lumber, sawlogs, live animals and other bulky freight, the shipper usually loads the freight into the cars."

But this rule of duty is not made applicable to a case where the cars are not to be loaded or unloaded at the station or upon the lands and tracks of the common carrier. It is nowhere held that, where cars are delivered upon a private siding, off the lands of the common carrier, the carrier must follow the car and unload it.

Authorities are also cited to establish that the carrier's contract includes, not only conveying the property, but its delivery to the consignee. I think this proposition will not be disputed. But there always remains the question: Where is the delivery to be made? In some cases delivery is made properly at the carrier's station or warehouse. In other cases it is made properly at the yard or upon a side track upon the lands of the carrier at a place convenient to the consignee for unloading. In no case has the carrier's contract made by a railroad company been held to include a delivery beyond its lines further than on the line of a connecting carrier, or upon a private side track. If this defendant had no side track, undoubtedly delivery of its car load freight would be complete when the plaintiff had delivered its cars at a place as convenient as possible in the yards or upon the side track upon the plaintiff's property, had notified the defendant of the arrival and placing of the car, and defendant had had a reasonable time in working hours to remove the same. The fact that the defendant company has a private siding, which it owns and controls, in its own yards, and the statute above quoted, do not change the place of delivery further than to fix the delivery point upon the private side track off the defendant's right of way. The movement to the defendant's storage and delivery tracks is the substantial equivalent of the "one movement" in "spotting" on ordinary sidetracks.

Cases are cited holding that a general custom forms the law of contracts, though at variance with their terms, and reference is then made to the evidence, which shows that the custom of spotting cars is very common, practically universal. But custom cannot modify a statute or its plain meaning. One plain purpose of the statute was to prevent discrimination by rendering a voluntary service without compensation to one shipper and not to all.

I have examined many of the opinions of the Interstate Commerce Commission. One of its decisions (Merchants' C. P. & S. Co. v. I. C.

R. R. Co., 17 Interst. Com. Com'n R. 98) is strongly urged by the defendant. It seems to me the facts in that case distinguish it from the case at bar. At Memphis, for more than 25 years, it has been customary for the railroad companies to give rates upon "flat cotton"; and the railroad company has undertaken to compress all cotton shipped. The warehouses are some distance from the railroad track, and it has been also the custom for the railroad company to pay the cost of draying. The published tariffs have shown that the charges for these two elements are included in the published freight rate to and from Memphis, although the particular amount charged for each of such services is not published separately. At South Memphis, the Memphis Warehouse Company provides tracks leading from the railroad yards to compress plants and to the warehouses of cotton dealers for switching and conveying cars of cotton from the railroad storage tracks to the compress plants and the warehouses. The railroad company pays the warehouse company 10 cents per bale for this service and 50 cents for compressing. These charges are also included in the published tariffs. The complaint in the case was against the allowances to the warehouse company for compressing and for switching and transferring to the warehouses of the consignees. The published rate is a special rate for cotton. It is alike for all dealers and for all shippers. In each case the published tariff covers the allowance made; and, whether or not it is strictly a service within transportation, it is a service covered by the freight rate published and charged, of which every shipper has notice. The payment of the allowance therefor causes no discrimination and gives no undue or unreasonable preference or advantage to any particular person. The practice does not offend against either section 2 or section 3 of the Act to Regulate Commerce. If the holding is based on a principle in conflict with that stated in the General Electric Case, I think that the former is the better decision. I do not understand that the General Electric Case turned on whether or not the allowance goes to "the owner." The shipper is usually the owner, and the allowance is by statute available to the shipper only.

The letter of March 24, 1894, indicates that the allowance was not looked upon as a payment for a service to be rendered or an instrumentality to be furnished in transportation, but as a concession because, under the arrangement, plaintiff would be relieved of considerable expense and labor. The letter states a reason why the arrangement was for the benefit of the parties, but it does not indicate (as perhaps it naturally would not, since the statute was later passed) that the parties intended to provide for payment of only that part of a transportation service which the defendant contemplated rendering.

[6] The plaintiff maintains that this matter has once been determined by the Interstate Commerce Commission, and that that determination is conclusive upon the claim in question. In 1906, after the plaintiff had ceased to make payments under the contract of 1894, the Act to Regulate Commerce was amended and contains the following in section 15:

"If the owner of property transported under this act directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no

more than is just and reasonable, and the Commission may, after a hearing on a complaint, * * * determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the service so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided for in this section."

This defendant filed its complaint with the Interstate Commerce Commission under that section, and this plaintiff came in and answered. Upon the same facts as appear in this case at bar, the Commission made its decision and entered an order dismissing the complaint. This order does not recite the grounds on which the complaint was dismissed, but those grounds are disclosed in the opinion (14 Interst. Com. Com'n R. 238). On page 242 of 14 Interst. Com. Com'n R. it says:

"The real question before us is whether the complainant, under the amended Act to Regulate Commerce, may lawfully make any charge and demand any compensation from the defendants upon the facts shown of record. Is the service performed by it a carrier's service? Is it a part of the transportation undertaken by the carrier?"

On page 245 of 14 Interst. Com. Com'n R.:

"In our judgment the complainant does nothing within its plant which it can lawfully call upon the defendants to do for it and therefore nothing for which it may lawfully demand compensation."

The opinion is filed with the order.

Under this section of the statute the Commission is given authority to pass upon two questions: (1) If (whether or not) the owner of property transported under this act directly or indirectly renders any service connected with such transportation or furnishes any instrumentality used therein; and (2) what is the reasonable charge therefor? By act of Congress the Interstate Commerce Commission was given authority to determine these two questions. It was therefore a court or tribunal of competent jurisdiction. The parties were the same as the parties herein. The well-settled general rule of estoppel is that the estoppel in a former judgment extends to every material matter within the issues which was expressly litigated and determined, and also to those matters which, although not expressly determined, are comprehended and involved in the thing expressly stated and decided, whether they were or were not actually litigated or considered. It is not necessary to the conclusiveness of a former judgment that issue should have been taken upon the precise point controverted in the second action. Whatever is necesarily implied in the former decision is, for the purpose of the estoppel, deemed to have been actually decided. Thorn v. De Breteuil, 179 N. Y. 82, 71 N. E. 470. The Commission did determine that the service, for which claim is made here, was not a transportation service. There has been no review or modification in any form of the said decision of the Interstate Commerce Commission. In People ex rel. Loughran v. Railroad Com'rs, 158 N. Y. 428, 53 N. E. 165, the court said, in speaking of a decision by the Railroad Commission:

"In consenting to the discontinuance of the station in question, we think the Board of Railroad Commissioners acted judicially. As was said in People v. N. Y., L. E. & W. R. R. Co., 104 N. Y. 58, 65, 9 N. E. 856, 859 (58 Am. Rep. 484): 'By creating, the statute recognizes the necessity for, such a tribunal to

adjust conflicting interests and controversies between the people and the corporation. It has clothed it with judicial powers to hear and determine, upon notice, questions arising between these parties.' The action of the board clearly was not legislative.  *  *  *  People ex rel. Harris v. Commissioners, 149 N. Y. 26 [43 N. E. 418]. It was, however, judicial, because the law impliedly required them to decide a question of fact and to exercise their judgment upon evidence in determining whether the consent should be given or not."

"Where a matter has been submitted to an authorized judicial tribunal, its decision is final between the parties until it has been reversed, set aside, or rejected; and the rule of res adjudicata applies to all judicial determinations, whether made in actions, or in summary or special proceedings, or by judicial officers in matters properly submitted for their determination." People ex rel. McCabe v. Matthies, 179 N. Y. 242, 248, 72 N. E. 103, 104.

In that opinion (179 N. Y. 250, 72 N. E. 105), the court says:

"It was its [the town board's] duty to determine the legality of the claim and whether it was a proper charge upon the town. 'The statute has created a board of town auditors to examine and decide upon claims made and presented against a town.  *  *  *  Such board is a statutory tribunal or court to hear and to allow or reject any claim presented against the town. The examination of the account is the trial and its allowance or disallowance is the judgment of this tribunal,' and the determination of the board, like the determination of all courts, is conclusive until reversed or modified under proceedings  *  *  *  instituted for its review."

See, also, Van Wormer v. Mayor, 15 Wend. 262; People ex rel. Hatzell v. Hall, 80 N. Y. 117; People ex rel. McCullough v. Snyder, 106 App. Div. 28, 94 N. Y. Supp. 541. It is probably true that the Commission did not have jurisdiction of the contract here in question, but it did have jurisdiction of, and did decide between these parties, the identical controlling question which must be decided in determining this case.

While, under the decision upon the merits above made, it is not necessary to pass upon this question, it would seem that, where the identical question has been tried before a competent tribunal authorized to try that question, where the records show that the facts are the same in the two cases, and the records in the proceedings before the Interstate Commerce Commission show the determination made by that Commission, and where the party, who is here seeking to maintain the claim is the same party which selected its own tribunal, brought the matter before the Commission and secured a determination after a full hearing, the decision of the Commission ought to be conclusive upon the parties.

The plaintiff may prepare findings and decision in accordance with the markings of the requests to find and in accordance with this memorandum, submit the same to defendant, and, if the attorneys cannot agree upon the form of the decision, it may be settled before me on three days' notice.

Judgment accordingly.