## INTERSTATE COMMERCE COMMISSION v. DIFFENBAUGH.

## INTERSTATE COMMERCE COMMISSION v. F. H. PEAVEY & COMPANY.

## UNION PACIFIC RAILROAD COMPANY v. SAME.

**APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.**

Nos. 285, 286, 287.　Argued October 13, 18, 1911.—Decided November 13, 1911.

The Interstate Commerce Act does not attempt to equalize fortune, opportunities or abilities; it contemplates payment of reasonable compensation by carriers for services rendered, and instrumentalities furnished, by owners of property transported, the only power of the Commission being to determine the maximum of such compensation.

Contracts made by various railroads for elevation expenses of grain at points of transshipment at rates not exceeding those fixed by the Commission as reasonable, *held* not to be illegal discriminations or rebates when paid to owners of elevators on their own grain although such owners performed services other than those paid for at the same time to their own advantage.

176 Fed. Rep. 409, modified and affirmed.

THE facts are stated in the opinion.

*Mr. P. J. Farrell* and *The Solicitor General*, for appellant in Nos. 285 and 286.

*Mr. Maxwell Evarts*, with whom *Mr. F. C. Dillard* and *Mr. Henry W. Clark* were on the brief, for appellant in No. 287.

*Mr. Frank Hagerman* and *Mr. John Barton Payne*, with whom *Mr. M. B. Koon* was on the brief, for appellees.

*Mr. Robert Dunlap* and *Mr. Gardiner Lathrop*, by leave of court, filed a brief for The Atchison, Topeka & Santa Fe Railway Company.

Mr. Justice Holmes delivered the opinion of the court.

These are appeals from injunctions issued upon bills brought by the appellees against the enforcement of two orders made by the Interstate Commerce Commission. 176 Fed. Rep. 409. The stages by which the Commission came to its present conclusion, against its earlier view, will be found reported in 10 I. C. C. Rep. 309, 12 *id.* 85, 14 *id.* 315. See 14 *id.* 317, 510, 551. In the Circuit Court these cases were tried upon the same evidence and they raise the same question; but as the Peavey suit presents that question in its initial and simplest form we will state the facts of that case first.

The Union Pacific Railroad, after passing through a grain country, has its eastern termini at Omaha and Kansas City, on the Missouri River. Much the greater part, nine-tenths, more or less, of the grain gathered and carried by the road passes beyond the termini, especially to points farther east. During the season the Union Pacific needs all its cars to collect the grain, and therefore wants to get them back as quickly as possible from the end of its line. Furthermore, the shipments eastward are made more profitably in heavier loads than can be collected from the local stations. For these reasons the Union Pacific sought to prevent its own cars being carried beyond the termini, over connecting lines, and to have the grain shifted to other cars. To make the change it is commercially necessary to pass the grain through an elevator, where also it is weighed, another necessary step in the transportation. See 14 I. C. C. Rep. 317, 318. An additional consideration is that Omaha and Kansas City are great grain markets where there are sales largely in excess

of local needs, and this also requires the grain to pass through elevators at these points. If the Union Pacific could not use these instruments of transfer it could not compete with other roads that have through lines from the grain fields across the Missouri River to the East. See 14 I. C. C. Rep. 317, 327.

Acting on these motives, the railroad company in 1899 made a contract in good faith with Peavey under which he built an elevator at Council Bluffs on the other side of the river from Omaha. He was to receive not exceeding 1¼ cents per hundred pounds for the first ten years, and one cent for the next ten, for grain transferred through his elevator. Later another elevator was brought into the arrangement, now with Peavey & Co., a corporation. Peavey & Co. is a large dealer in grain and receives the same allowance for its own grain that it receives for that of others. It is important to remark that in no case is any additional charge made to the shipper for the elevator service. In 1904 the Interstate Commerce Commission investigated the matter and upheld the contract, including the allowance for Peavey & Co's own grain. 10 I. C. C. Rep. 309.

The Commission also made a report to Congress, and after further investigation, notwithstanding the fact that the incidental advantages to grain owners from such allowances had been made apparent, Congress passed the act of June 29, 1906, c. 3591, 34 Stat. 584. By this it was provided in § 1, amending the earlier statute, that "the term 'transportation' shall include . . . all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported; and it shall be the duty of every carrier subject to the provisions of this Act to

provide and furnish such transportation upon reasonable request therefor, and to establish through routes," etc. By § 6 the carrier was required to state separately in its schedules all terminal charges and all privileges or facilities granted or allowed, and by § 15 "If the owner of property transported under this Act directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable, and the Commission may, after hearing on a complaint, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the service so rendered or for the use of the instrumentality so furnished." Thus Congress clearly recognized that services such as those rendered by Peavey & Co. were services in transportation and were to be paid for notwithstanding the possibility that some advantage might be gained as a result. Meantime other elevators had sprung up, and in 1906 the Union Pacific extended the allowance made to Peavey & Co. to all elevators in Omaha, Council Bluffs and Kansas City.

But the Interstate Commerce Commission had begun to change its view upon further reflection. In 1907, upon rehearing, it cut down the allowance to Peavey & Co. to three-quarters of a cent, estimating that to be the actual cost, and being of opinion that to allow any profit would be in effect to permit a rebate. 12 I. C. C. Rep. 85. The order made required the railroad company to desist from paying more than three-fourths of a cent per hundred pounds, for service rendered in the transfer or elevation of grain at Council Bluffs or Kansas City, to any one interested in the buying, selling or shipment of grain at those places, especially naming the appellees. This is one of the orders complained of. The chief object of complaint, however, is an order made in the following year, on June 29, 1908. In that the Commission took the last

step and ordered the Union Pacific to desist from paying any allowance to Peavey & Co. on grain in which they have any interest that is not reshipped from their elevators within 10 days, or that has been mixed, treated, weighed or inspected in any of their elevators at the above named points. 14 I. C. C. Rep. 315.

The ground on which the payment to owners of grain finally was held to be a rebate had been considered from the beginning and, as we have said, had been brought to the mind of Congress. It is that when the owners of the elevators own the grain put into them they have the opportunity to perform other services to the grain in the way of treatment, or cleaning, clipping, and mixing the grain, which although not included under the term elevation or paid for by the railroad, it is an advantage to them to be able to perform at the same time. This advantage is thought to create an undue preference and unjust discrimination. Of course the opportunities for fraud are adverted to, but the ground of the decision is that even an honest payment of the bare cost of elevating grain in transit gives an undue advantage if the elevator owner also owns the grain. As was pointed out by the court below the final order is confined to grain that has been treated, weighed, inspected, or mixed.

We agree with the court below that this decision is erroneous in its conception of the grounds on which under the statute an advantage may be pronounced undue, and in its assumption that Congress has left the matter open by merely permissive words. The principle as to advantages is recognized in *Penn Refining Co.* v. *Western New York & Pennsylvania R. R. Co.*, 208 U. S. 208, 221. The law does not attempt to equalize fortune, opportunities or abilities. On the contrary the act of Congress in terms contemplates that if the carrier receives services from an owner of property transported, or uses instrumentalities furnished by the latter, he shall pay for them. That is

taken for granted in § 15; the only restriction being that he shall pay no more than is reasonable, and the only permissive element being that the Commission may determine the maximum in case there is complaint (or now, upon its own motion. Act of June 18, 1910, c. 309, § 12, 36 Stat. 539, 551). As the carrier is required to furnish this part of the transportation upon request he could not be required to do it at his own expense, and there is nothing to prevent his hiring the instrumentality instead of owning it. In this case there is no complaint that the rate out of which the allowance is made is unreasonable, and it is admitted that three-quarters of a cent barely would pay the cost of the service rendered without any reasonable profit to Peavey & Co. for the work. See *Interstate Commerce Commission* v. *Stickney*, 215 U. S. 98.

In the Diffenbaugh case the order of the Commission bore the same date, June 29, 1908, as that against Peavey & Co. and the Union Pacific. It was directed against the Chicago, Burlington & Quincy Railroad Company and other competitors of the Union Pacific, and forbade their paying any sum as compensation for service rendered in the elevation of grain at Kansas City, Missouri, and other Missouri River points upon their lines. Competition, which was an element in the motives of the Union Pacific, led these other roads to make a similar arrangement. Probably, being through lines, they would not object to the Commission's order if that to the Union Pacific could be sustained. The opinion of Mr. Commissioner Prouty in this case takes somewhat different ground from that on which the orders in the Peavey case are based. 14 I. C. C. Rep. 317. See 15 *id.* 90, 93. See also *H. Gund & Co.* v. *Chicago, Burlington & Quincy R. R. Co.*, 18 I. C. C. Rep. 364. Especially it throws doubt upon the allowance being properly a transfer allowance at this present day. As the contract with Peavey & Co. purports to be only for grain transferred, it is not necessary to consider

whether elevation could be allowed for as practically necessary under modern conditions even if the grain did not go on. For the purposes of this case so much of the order as meets the above-mentioned doubt by confining payments to grain reshipped within ten days seems proper enough and not open to review on the matter of fact. But when the grain has been treated the prohibition of an allowance is universal, and therefore the question that we have answered is raised by the record; the question, that is, of the power of the Commission to prohibit such allowances to grain owners in general terms. In this order it was stated expressly that the purpose of the Commission was to prohibit and stop the payment of the elevator allowances everywhere. 14 I. C. C. Rep. 510. *Ibid.* 551.

The Union Pacific made the allowances in question to elevators at its termini; it had no motive to make them anywhere else. The competitors of the Union Pacific concerned in the Diffenbaugh case were compelled by competition to make the same allowance at Missouri River points, but they also make it nowhere else. The Traffic Bureau, Merchants' Exchange of St. Louis, complained to the Commission that the result was a discrimination against St. Louis of ¾ of a cent per 100 pounds. But the principle of the decision is that the allowance to elevators upon their own grain is to be stopped everywhere unless they are prevented from using the opportunity for treating their grain. Therefore this question of preference between cities does not need to be discussed. But, as remarked below, the Union Pacific could not be complained of on this ground, 176 Fed. Rep. 424, and it would be impossible to deny the same right to competing roads, merely because as the result of the conditions one city would gain and another lose. *Louisville & Nashville R. R. Co.* v. *Behlmer*, 175 U. S. 648.

Although the order cutting down the allowance to

Peavey & Co. to the estimated cost may have been influenced by erroneous views touching the powers of the Commission and the elements proper for consideration (see *Southern Railway Co. v. St. Louis Hay & Grain Co.,* 214 U. S. 297), we are of opinion that no sufficient reason appears for disturbing that. The Commission has decided what compensation is reasonable, and we infer that Peavey & Co. would be content under the circumstances to render the service for three-quarters of a cent per hundred pounds rather than give it up.

The jurisdiction in the Diffenbaugh case was doubted, although the Commission did not press the point as it wishes a final decision. We are content to leave that matter on the statement of the court below. 176 Fed. Rep. 416, 417. The plaintiffs are affected by the order and it is just that they should have a chance to be heard, although not parties before the Commission.

The result is that the decree of the Circuit Court must be affirmed in its main point, but that the Commission's order of 1907, diminishing the allowance to three-quarters of a cent, and so much of the Peavey order of 1908 as confines allowances to grain reshipped within ten days, should be allowed to stand.

*Decree of Circuit Court modified and affirmed.*


Mr. Justice McKenna, with whom concurred Mr. Justice Hughes, dissenting.


I am unable to concur in the opinion of the court.

The Commission did not hold that elevation may not properly be furnished by a railroad or be allowed for to a shipper, but held that "such elevation must be charged for at what it is reasonably worth," and without discrimination. And I understand elevation to mean "the transfer of the grain from the car of the inbound carrier, through an elevator to the car of the outbound carrier" within a

given period. "In such elevation," Mr. Commissioner Harlan said, and his language I adopt, "there is nothing either preferential or discriminatory, whether done in an elevator operated by the carrier or in an elevator operated for it by the owner," but "any allowance by the carrier to the owner of an elevator on grain belonging to him that has been weighed, inspected, cleaned, mixed or otherwise treated in the process of elevation, is unlawful. As a facility for the convenience of the carrier free elevation is unobjectionable, but when the owner is permitted to and does use the elevation as a transit privilege for himself, by means of which to secure commercial advantages on his own grain, the result is an unlawful preference and discrimination."

The conclusion is not a misconstruction of the statute. Transportation simply is the business of the railroad company. Weighing, inspecting, cleaning and mixing, that is, raising the quality of the grain to suit the demand of the market, is the business of the grain dealer or others, and the two businesses are not to be confounded, and it was not, I think, the purpose of the statute to confound them. The statute makes the term "transportation" include "all instrumentalities and facilities of shipment or carriage," and it is only when the owner of property renders services "connected with such transportation, or furnishes any instrumentality used therein," that he may be compensated by the railroad. What goes beyond that transcends the statute and becomes, as the Commission held, a discrimination.

I am authorized to say that MR. JUSTICE HUGHES concurs in this dissent