## UNITED STATES ex rel., MEMBERS OF WASTE MERCHANTS' ASS'N OF NEW YORK, VOLUNTARY ASS'N, v. INTERSTATE COMMERCE COMMISSION.

(Court of Appeals of District of Columbia. Submitted April 4, 1921. Decided December 5, 1921. Writ of Error to Remove Cause to Supreme Court of United States Allowed December 24, 1921.)

No. 3498.

1. Commerce ☞85—Interstate Commerce Commission is required to allow compensation for services performed by shipper.

Under the amendment to Interstate Commerce Act, § 15, by Act June 29, 1906, § 4 (Comp. St. § 8583), providing for compensation to the owner of property transported for services rendered by such owner, the owner of the goods, who loaded them into the cars, though the loading was included in the services for which the tariff rate was fixed, is entitled to reasonable compensation for such services, even though the agreement it should load the goods was for the mutual benefit of the owner and the carrier, and the statute requires the Commission to fix a reasonable allowance for such services, and was not intended merely to prohibit an excessive allowance.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Carriers ☞32 (2)—Allowance for shipper's services cannot be denied in one case and allowed in similar case.**

Since reasonable compensation by a carrier to a shipper for legitimate services rendered by the shipper is not a rebate or discrimination, the Interstate Commerce Commission may not allow compensation for such services in one case, and withhold it in another case, where similar services have been performed, for such a course would constitute discrimination.

3. **Carriers ☞32 (2)—Shipper's service in loading held bona fide.**

The test of the right of a shipper to compensation for services rendered is whether there was a reasonable and proper basis for the performance of the services, and there was such basis when the shipper loaded goods which it was the carrier's duty to load under its published tariff, on the carrier's suggestion that, because of labor shortage due to the war, there would otherwise occur delay in loading.

4. **Mandamus ☞101—Lies to compel Interstate Commerce Commission to perform statutory duty.**

Where the Interstate Commerce Commission refused to award compensation for the services rendered to the carrier, because it misconceived the effect of the statute requiring such compensation as that statute had been interpreted by the Supreme Court, the shipper is entitled to mandamus to compel said Commission to make such allowance.

Smyth. Chief Justice, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Petition for mandamus by the United States, on the relation of the members of the Waste Merchants' Association of New York, Voluntary Association, against the Interstate Commerce Commission. From a judgment dismissing the petition, relators appeal. Reversed and remanded.

Alexander H. Bell, Percy H. Marshall, and F. J. Rice, all of Washington, D. C., for appellants.

P. J. Farrell, of Washington, D. C., for appellee.

ROBB, Associate Justice.   This appeal is from a judgment in the Supreme Court of the District dismissing appellant's petition for a writ of mandamus directing the appellee, Interstate Commerce Commission, to fix the amount of damages or compensation to which appellant alleges it is entitled for services performed for the carriers in connection with the loading of certain freight shipped by it. The case was disposed of on petition, answer, and demurrer to the answer.

Ordinarily, shippers are required to load carload freight, but carriers serving New York Harbor points, owing to conditions peculiar to that locality, have undertaken this work, and a charge therefor is included in their published tariff rates.   In the early part of 1917, shippers of paper stock from New York were informed by the carriers that labor was so scarce and difficult to obtain that the service of loading cars must be performed by the shippers, and thereafter this service was performed by appellant as to freight shipped by it from that point, to the extent of many thousand carloads.   A controversy having arisen as to compensation for the performance of this service by the shippers, a complaint was filed by them with the appellee Commission.   An examiner was appointed, and the undisputed evidence adduced was to the

effect above indicated. The examiner recommended that the shippers receive as reparation an amount to be determined on the basis of 12 cents per ton and a minimum of $2 per car. A hearing before the Commission resulted in a report on June 1, 1920—the Commission holding that the variance from the practice of the tariff undertakings was as much in the interest of the shippers as of the carriers; that the rates collected were not unreasonable, unjustly discriminatory, or unduly prejudicial for the transportation service rendered, although, in reviewing the evidence, the Commission found:

"There is no evidence to indicate that the rates or the charges paid on complainant's shipments were excessive for the total transportation service actually rendered to them by the carriers, *excluding loading*." (Italics ours.)

In its report the Commission said:

"It is undisputed that defendants did not load a large part of complainant's members' paper stock into cars during this period, contrary to their tariff undertaking, and that employees of these shippers actually performed the loading service."

The Commission then pointed out that, owing to unusual conditions, it was to the advantage of the shipper to be permitted to do the loading, as otherwise there would have been great delay and a corresponding limitation in the amount shipped. The Commission then said:

"Either the carriers or the shippers suggested that the movement of paper stock would be facilitated, if the shippers were willing to load their paper stock into empty cars for out-bound movement. The evidence is somewhat conflicting as to the origin of this suggestion. However, from the evidence as a whole, there is little doubt that an agreement, tacit or expressed, was arrived at between the carriers and the shippers of paper stock by which the latter undertook to do their own loading of the cars if they were permitted to drive their trucks onto the piers of the former with but short periods of waiting."

This arrangement the Commission found to have been "for the mutual benefit of both parties under the extraordinary conditions of war times," but also said:

"It is obvious as pointed out above, that the carriers did not fulfill their complete obligation under the tariffs during the prevalence of war conditions, and as a consequence the shippers were compelled to incur the expense of loading by means of their own employees."

Further allusion to the departure of the carriers from their published tariffs was made in these words:

"For any failure to observe their published tariffs the carriers may be answerable in another process."

[1] In section 15 of Act Feb. 4, 1887, c. 104, as amended by section 4 of Act June 29, 1906 (34 Stat. 584; Comp. St. § 8583[8]), amending "An act to regulate commerce," it is provided:

"If the owner of property transported under this act directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be no more than is just and reasonable, and the Commission may, after hearing on a complaint, * * * determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered

or for the use of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided for under this section."

In Interstate Com. Comm. v. Diffenbaugh, 222 U. S. 42, 32 Sup. Ct. 22, 56 L. Ed. 83, it was held that contracts made by various railroads for elevation expenses of grain at points of transshipment at rates not exceeding those fixed by the Commission as reasonable, did not amount to illegal discriminations or rebates when paid to owners of elevators on their own grain, although such owners performed services other than those paid for at the same time to their own advantage. It was further held that the act of 1906 contemplates payment of reasonable compensation by carriers for services rendered or facilities furnished by owners of property transported, *the only power of the Commission being to determine the maximum of such compensation.* After quoting that part of section 15 above set forth, the court said:

"Thus Congress clearly recognized that services such as those rendered by Peavey & Co. were services in transportation and were to be paid for notwithstanding the possibility that some advantage might be gained as a result."

Later in the opinion the court said:

"The law does not attempt to equalize fortune, opportunities or abilities. On the contrary, the act of Congress in terms contemplates that if the carrier receives services from an owner of property transported, or uses instrumentalities furnished by the latter, he shall pay for them. That is taken for granted in section 15, the only restriction being that he shall pay no more than is reasonable, and the only permissive element being that the Commission may determine the maximum in case there is complaint (or now, upon its own motion. Act June 18, 1910, c. 309, § 12, 36 Stat. 539, 551." ·

In Union Pac. R. R. v. Updike Grain Co., 222 U. S. 215, 32 Sup. Ct. 39, 56 L. Ed. 171, where a railroad company had refused to pay the owner of an elevator located on other railroads compensation for elevating grain similar to that paid to owners of elevators located on its own railroad, because of failure to return cars within an unreasonable time fixed by that railroad, the court said:

"When the service was rendered, the carrier received value for which it was bound to pay, whether performed by the owner of the grain or some other person hired for the same purpose. Having earned the compensation, the elevator company could not be deprived of its right because foreign cars were not returned to the Union Pacific under the rules of the railway association, of which the Union Pacific was a member and over which the elevator companies had no control."

It thus appears that the Supreme Court, prior to the ruling of the Commission in this case, had interpreted section 15 as clearly contemplating that for any legitimate service performed for the carrier by a shipper the Commission, either upon its own motion or after complaint, should make a reasonable allowance. In the present case the Commission has found that service was performed, but it has declined to make any allowance whatever, because satisfied that the arrangement was to the mutual advantage of the parties. The Commission in its report said:

"Nothing in the act requires that a shipper must be reimbursed, for transportation service that he may elect to perform primarily for his own convenience," and that section 15 of the act "is intended merely to provide against excessive allowances."

This conclusion, in our view, is inconsistent with the interpretation placed upon the statute by the Supreme Court. It must be presumed that every arrangement contemplated by the statute would be to the mutual advantage of the parties, else it would not be entered into in the first place. There is nothing in the statute upon which to base a conclusion that Congress intended to withhold compensation from shippers performing proper services for a carrier, where, as here, the arrangement was for their mutual advantage, the theory of the statute evidently being that the carrier, receiving from the shipper services which, under the carrier's tariff schedules, it was obligated to perform, should in fairness be compelled to make reasonable allowance therefor—and this, as we read its decisions, is what the Supreme Court has held.

[2, 3] In view of the surrounding circumstances as disclosed by the record, and the absence of a finding to the contrary by the Commission, it is fair to assume that when these services were performed by the shippers they expected to be reasonably compensated therefor. Certainly it is nowhere suggested that their arrangement with the carriers did not contemplate compensation. The Supreme Court having held that reasonable compensation to a shipper for legitimate services rendered the carrier does not constitute a rebate or discrimination, it logically follows that the Commission may not allow compensation in one case and withhold it in another, where similar services have been performed, for such a course would constitute discrimination in favor of one shipper and against the other. In our view, the test as to the right to compensation is the bona fides of the transaction—whether, in the light of surrounding circumstances, there was a reasonable and proper basis for the performance of the services.

That there was such a basis in the present case is not disputed.

The carrier could not fulfill its tariff undertaking and entered into an arrangement with the shipper whereby the shipper in good faith performed services which, under the law, the carrier should have performed. Under these facts, the shipper was "entitled to demand a compensation reasonably commensurate with the facilities furnished and the services performed." United States v. Balt. & Ohio R. R. Co., 231 U. S. 274, 293, 34 Sup. Ct. 75, 81 (58 L. Ed. 218).

[4] The question then presents itself as to whether mandamus is the proper remedy. The solution of this question likewise is to be found in a decision of the Supreme Court. In Kansas City So. Ry. v. Interstate Com. Comm., 252 U. S. 178, 40 Sup. Ct. 187, 64 L. Ed. 517, the Commission had failed to give force and effect to a statute requiring it to report, inter alia, the present cost of condemnation and damages or of purchase of the lands, rights of way and terminals of carriers in excess of their original cost or present value, apart from improvements. After stating the case the learned Chief Justice, who wrote the opinion, said:

"It is obvious from the statement we have made, as well as from the character of the remedy invoked, mandamus, that we are required to decide, not a controversy growing out of duty performed under the statute, but one solely involving an alleged refusal to discharge duties which the statute exacts. * * * We are of opinion, however, that, considering the face of the statute and the reasoning of the Commission, it results that the conclusion of the Commission was erroneous, an error which was exclusively caused by a mistaken conception by the Commission of its relation to the subject, resulting in an unconscious disregard on its part of the power of Congress and an unwitting assumption by the Commission of authority which it did not possess."

In the present case the Commission's conclusion of law is inconsistent with its finding of fact, and this inconsistency results from a misconception of the statute, as interpreted by the Supreme Court. The complaint is not that the Commission has erred in the exercise of its discretion, but rather that its failure to give effect to the plain mandate of the statute amounts to a refusal to exercise any discretion under the statute. This circumstance, as indicated by the Supreme Court in the case just reviewed, justified the remedy sought, no other adequate remedy being available.

The judgment is reversed, with costs, and the cause remanded, with directions to issue the writ.

Reversed and remanded.

SMYTH, Chief Justice, dissents.