593 F.2d 865
 50 A.L.R.Fed. 402
 BUD ANTLE, INC., Plaintiff-Appellant,
v.
UNITED STATES of America, Interstate Commerce Commission,
Robert W. Meserve, Paul W. Cherington and Charles W.
Bartlett, Trustees of the property of Boston& Maine
Corporation, a corporation, debtor, Delaware & Hudson
Railway Company, a corporation, Thomas F. Patton and Ralph
S. Tyler, Jr., trustees of the property of Erie Lackawanna
Railway Company, a corporation, debtor, George P. Baker,
Richard C. Bond, Jervis Langdon, Jr., and Willard Wirtz,
trustees of the property of Penn Central Transportation
Company, a corporation, debtor, Southern Pacific
Transportation Company, a corporation, and Atchison, Topeka
& Santa Fe Railway Company, a corporation, Defendants-Appellees.
 No. 76-1777.
 United States Court of Appeals,
Ninth Circuit.
 March 21, 1979.
 
 Richard D. Maltzman (argued), of Titchell, Maltzman, Mark, Bass & Ohleyer, San Francisco, Cal., for plaintiff-appellant.
 A. J. Thiemann (argued), Dept. of Justice, Washington, D. C., John A. Daily (argued), Philadelphia, Pa., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before BROWNING, CARTER and ANDERSON, Circuit Judges.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 Appellant Bud Antle, Inc. (Antle) appeals from a judgment of the district court affirming an order of the Interstate Commerce Commission (Commission) dismissing Antle's complaint for reparations and other relief against appellee railroads.[1] Jurisdiction existed in the district court under 49 U.S.C. § 17(9) and 28 U.S.C. § 1336.[2]
 
 
 2
 Antle claims that both the Commission and the district court erred as a matter of law in denying its claim for reparations and must be reversed. For the reasons set forth below, we agree.
 
 BACKGROUND
 
 3
 Antle is a large shipper of fresh produce from origins in California and Arizona to destinations in eastern states. Appellees Southern Pacific Transportation Company (SP) and Atchison, Topeka & Santa Fe Railway Company (Santa Fe), the "originating carriers," transport Antle's produce from the West for transfer to the remaining appellee railroads,[3] the "connecting carriers," at interchange points in the Midwest for continued transportation and delivery to the East.
 
 
 4
 During the period in question, Antle utilized refrigerated trailers on flatcars (TOFC), otherwise known as "piggyback" service, to ship large quantities of perishables on the through routes and at rates established and concurred in by the appellee railroads in Transcontinental Freight Bureau Tariff 64-N (Tariff 64-N).[4] Under the applicable TOFC service plan, the trailers were to be supplied by the carrier from the point of origin.[5] Because the originating carriers furnished the trailers, the connecting carriers separately compensated those carriers for the use and possession of that equipment while on their respective lines.
 
 
 5
 In an effort to alleviate the impact of existing and anticipated shortages of refrigerated trailers,[6] Antle undertook to augment the carrier supply of trailers by the acquisition and operation of its own trailers. In October 1968, Antle and Southern Pacific, the principal originating carrier, entered into an agreement for the use of Antle's trailers on SP lines.[7] In accordance with the agreement, Southern Pacific published a per diem allowance, effective December 11, 1968, for the use of any trailers furnished, at the railroad's option, by shippers.[8] Santa Fe later established a similar allowance, effective March 1, 1970.
 
 
 6
 Antle began shipping its produce in its own trailers (with its "reporting mark" BUDZ) in January 1969. Because the published allowances applied only to use of the trailers on the lines of the originating carriers, Antle endeavored to secure similar allowances from the connecting carriers. The connecting carriers accepted the Antle-supplied trailers at the interchange points at all relevant times, but delayed or refused to publish allowances for the use of the trailers.[9]
 
 
 7
 Antle then requested the originating carriers to place their own "reporting marks" on the trailers and collect allowances from the connecting carriers on Antle's behalf. The originating carriers refused to do so, insisting that it was Antle's responsibility to make arrangements with the connecting carriers for compensation.
 
 
 8
 In October 1970, Antle filed a complaint with the Commission, alleging that the refusal or failure of the connecting carriers to publish an allowance for the use of its trailers constituted an unjust and unreasonable practice and resulted in an undue advantage to Antle's competitors in violation of certain sections of the Interstate Commerce Act.[10] Antle requested the Commission to require the connecting carriers to publish allowances and to reimburse Antle for the use of its trailers during the time when no allowance had been published. Alternatively, Antle asked that the originating carriers be required to place their reporting marks on Antle's trailers and be held liable for their failure to collect allowances from the connecting carriers on Antle's behalf.
 
 
 9
 The Hearing Examiner concluded that Antle was entitled to reparations from the connecting carriers, but not to other relief sought. His decision was approved by Review Board 4, but was subsequently reversed in pertinent part by Division 2 of the Commission. The district court affirmed the Commission's order dismissing Antle's complaint.
 
 
 10
 Antle now requests this court to set aside the Commission's decision and remand this case to the Commission with appropriate directions. Primarily at issue here is the application and effect of § 15(13), now § 15(15), of the Interstate Commerce Act.[11] That section provides in relevant part as follows:
 
 
 11
 "If the owner of property transported under this chapter directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be published in tariffs or schedules filed . . . and shall be no more than is just and reasonable, and the Commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order . . ."
 
 STANDARD OF REVIEW
 
 12
 Review of orders of the Interstate Commerce Commission is limited. Under the Administrative Procedures Act, the reviewing court may only
 
 
 13
 "(2) hold unlawful and set aside agency action, findings, and conclusions found to be
 
 
 14
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, (or)
 
 
 15
 (E) unsupported by substantial evidence . . ."
 
 
 16
 5 U.S.C. § 706. See Bowman Transp. v. Arkansas-Best Freight, 419 U.S. 281, 284, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); Widing Transp., Inc. v. Interstate Commerce Commission, 545 F.2d 652, 658 (9th Cir. 1976).
 
 
 17
 The reviewing court ought not to weigh the evidence and should "inquire into the soundness of the reasoning by which the Commission reaches its conclusions only to ascertain that the latter are rationally supported." United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972). But we are not precluded from intervening if the Commission has failed to exercise its authority or discretion by an improper application of the law to the established facts. United States v. Interstate Commerce Commission, 91 U.S.App.D.C. 178, 188, 198 F.2d 958, 968 (1951); United States ex rel. Members of Waste Merchants' Ass'n of New York v. Interstate Commerce Commission, 51 App.D.C. 136, 140, 277 F. 538, 542 (1921), Rev'd on other grounds, 260 U.S. 32, 43 S.Ct. 6, 67 L.Ed. 112 (1922).
 
 
 18
 Because of its construction of § 15(13) of the Act, the Commission maintains it was not empowered to require the payment of past allowances or the publication of future allowances. Antle contends that § 15(13) presents no such obstacle. Our principal concern in this case, therefore, is the application of the proper legal standard to the factual circumstances.
 
 PRIOR PROCEEDINGS
 
 19
 Upon submission of the evidence by modified procedure,[12] the Hearing Examiner found that the Commission could not direct a carrier to publish an allowance under § 15(13), but that in appropriate circumstances, it may so order as an implicit part of its power to enforce the railroad's duty to furnish adequate car service. He declined, however, to issue a formal order requiring publication because of practical problems involved in leaving the carriers the option to furnish the equipment and because such remedial action did not appear necessary at that time.
 
 
 20
 With respect to compensation for the past use of Antle's trailers, the Hearing Examiner determined that § 15(13) of the Act did not authorize reparations or "retroactive allowances" because it was intended only to prevent payment of excessive allowances. He noted, however, that in spite of § 15(13), the Commission had awarded reparations in the past to shippers and concluded that the basis for such orders could be found in § 1 of the Act.
 
 
 21
 In resolving the question whether the connecting carriers had acted unreasonably, the Hearing Examiner took particular notice of Erie's assertion that it had a supply of trailers available, that it had never been advised by the originating carriers of their inability to supply trailers, and that it had not received any request from Antle to provide railroad-owned trailers. But the Hearing Examiner questioned the availability of the trailers because of the practical difficulties geographically in providing a dependable supply of trailers to a West Coast shipper and because there was no evidence that any of the connecting carriers had ever furnished trailers under Tariff 64-N. Finally, although recognizing mitigating circumstances for the refusal of the connecting carriers to provide allowances, the Hearing Examiner nevertheless concluded that those circumstances did not justify the refusal to adopt Antle's "concrete" and "reasonable" proposal for an allowance. The connecting carriers' failure to publish an allowance was therefore found by the Hearing Examiner to be an unreasonable practice entitling Antle to reparations.
 
 
 22
 The Commission, in reversing that finding, interpreted § 15(13) as a limitation of its power to award reparations when a shipper has rendered services or furnished instrumentalities before an allowance has been published. In support of its conclusion that Antle was not entitled to reparations, the Commission stated:
 
 
 23
 "(I)t is apparent that complainant voluntarily furnished its trailers to the originating carriers without regard to the rights obligations (sic) of the connecting carriers, and that complainant knew that the connecting carriers had no tariff provision on file with respect to the payment of the allowance."
 
 
 24
 The Commission ultimately found that in the absence of a published allowance, which, the Commission also noted, it had no authority under § 15(13) to compel, the refusal of the connecting carriers to pay an allowance was not an unreasonable or unjust practice in violation of § 1 of the Act.
 
 
 25
 The district court affirmed the Commission's order dismissing Antle's complaint, but suggested that § 15(13) did not necessarily preclude reparations under § 1 of the Act if the shipper was forced to perform transportation services because the carrier had defaulted in its statutory duty to provide those services. The district court understood Antle's contention to be that the connecting carriers had so defaulted; it found the contention untenable in the absence of any demand by Antle that the connecting carriers supply trailers and of any consequent refusal by those carriers to do so.
 
 PAYMENT OF REPARATIONS
 
 26
 Antle claims that it is entitled to reparations because the connecting carriers' refusal to publish an allowance for use of its trailers was an unreasonable practice in violation of section 1 of the Act.
 
 
 27
 Section 1 of the Act, 49 U.S.C. § 1, imposes certain duties on the railroads. Generally, the railroads must furnish transportation and facilities, establish reasonable through routes and just rates, and provide for reasonable compensation to those entitled, section 1(4); make just and reasonable charges for services rendered, section 1(5); establish and enforce just and reasonable classifications of property for transportation, section 1(6); and furnish safe and adequate car service, section 1(11).[13]
 
 
 28
 The railroads have not only the obligation to furnish, upon reasonable demand, the transportation services, facilities and instrumentalities required by law, but conversely the right to insist on the shippers' use of those services the carriers are willing and able to provide. General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 428, 60 S.Ct. 325, 84 L.Ed. 361 (1940); Atchison, Topeka & Santa Fe Railway Co. v. United States, 232 U.S. 199, 214-15, 34 S.Ct. 291, 58 L.Ed. 568 (1914); Southern Pacific Co. v. United States, 298 F.Supp. 971, 972 (N.D.Cal.1969); Use of Privately Owned Refrigerator Cars, 201 I.C.C. 323, 373 (1934). This corollary right is a matter of economic necessity; otherwise railroad investments would not be sufficiently protected. Atchison, Topeka & Santa Fe Railway Co. v. United States, 232 U.S. at 215, 34 S.Ct. 291.
 
 
 29
 Under § 15(13) and by general practice, however, the railroads, at their option, may, in lieu of furnishing services or instrumentalities within their obligation, employ or permit the owner of property transported to provide the service and pay an allowance therefor. General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. at 428-30, 60 S.Ct. 325; Interstate Commerce Commission v. Diffenbaugh, 222 U.S. 42, 46, 32 S.Ct. 22, 56 L.Ed. 83 (1911); Cancellation of Private Car Allowances, 322 I.C.C. 565, 570 (1964); Mumby Lumber & Shingle Co. v. Chicago, M., St. P. & P. R. R. Co.,200 I.C.C. 261, 263 (1934); Cambria Steel Co. v. Director General, 64 I.C.C. 737, 740 (1921). Cf. United States v. Baltimore & Ohio Railroad Co.,231 U.S. 274, 34 S.Ct. 75, 58 L.Ed. 218 (1910). Thus, if a shipper legitimately performs a service, it is "entitled, under the plain terms of § 15(13), to be paid by the carrier a just and reasonable allowance . . . ." General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. at 431, 60 S.Ct. at 330. That the carrier will pay for the services rendered is "taken for granted in § 15(13)." Interstate Commerce Commission v. Diffenbaugh,222 U.S. at 46-7, 32 S.Ct. 22.
 
 
 30
 By agreement the originating carriers here opted not to perform their obligation under Tariff 64-N to supply refrigerated trailers but to permit Antle to furnish its own trailers for transportation of its produce. In a published tariff, these carriers provided for a per diem allowance to be paid Antle for the use of its trailers on their lines. Because the connecting carriers initially refused to publish similar allowances, however, Antle was not compensated for the use of its cars on their lines. When Antle sought compensation by complaint to the Commission, the connecting carriers responded that they were under no compulsion to pay an allowance, and could not be required by the Commission to do so, because Antle never established that the connecting carriers had been unable or had refused to supply Antle with the trailers required.
 
 
 31
 The Commission adopted the position that Antle was not entitled to reparations because allowances could not be paid without prior publication in a tariff as required by § 15(13). Because the condition of publication was not met and because Antle knew that no published allowance was in effect, Antle was precluded, according to the Commission, from recovering compensatory damages from the connecting carriers for the use of the trailers furnished during the time the allowance was not published.
 
 
 32
 However, to the extent that the Commission (and the connecting carriers in reliance thereon) considers recovery by Antle to be barred by the publication requirement of § 15(13), it is mistaken, not only by the terms and intent of the statute, but by case law and its own authority.
 
 
 33
 The provisions of § 15(13) were not initially included in the Interstate Commerce Act of 1887 but were added in 1906 in substantially their present form. In response to public outcry and shipper complaints about oppressive rates and secret rebates, Congress undertook to invest the Commission with power not only to fix maximum rates but to determine reasonable allowances, as a maximum, to be paid by carriers for services rendered by shippers. See H.Rep. No. 591, 59th Cong., 1st Sess. 4-5 (1906). Congress contemplated that the railroads would either provide a transportation service or pay for the performance of that service, "the only restriction being that (the carrier) shall pay no more than is reasonable, and the only permissive element being that the Commission may determine the maximum in case there is complaint (or now upon its own motion . . .)." Interstate Commerce Commission v. Diffenbaugh, 222 U.S. at 46-47, 32 S.Ct. at 24.
 
 
 34
 The language specifically requiring publication of allowances was included in 1940 merely "to sanction the present requirement of the Commission that allowances must be published." S.Rep. No. 433, 76th Cong., 2d Sess. 16 (1939). The change was therefore cosmetic; it neither enlarged nor circumscribed the powers of the Commission.
 
 
 35
 The Commission infers from the terms of the statute that it has no authority to act until publication of an allowance, and that, upon publication, its authority is limited solely to a determination of the maximum permissible to be paid. See e. g., Rutherford-Brede Co. v. Director General, 61 I.C.C. 515, 517 (1921). The Commission also insists that the statute is intended to guard against excessive rebates and nothing more. See e. g., Allowances for Use of Trailers, 299 I.C.C. 513, 514-15 (1956). But the terms of the statute are not restrictive; nor was the intent of the legislation so narrow. Congress acted generally to enlarge the powers of the Commission; it sought in particular to rectify the abuses prevalent at that time with respect to the payment of secret allowances to some shippers to the detriment of others. But it did not bar the payment of allowances to shippers. There is nothing to suggest that Congress intended to relieve the railroads of their general duty to either provide transportation services or pay for the performance of those services, or to preclude complaint to the Commission for enforcement of that obligation by the Commission. The Commission has once again engaged in "leaping from a particular authorization to a pervasive prohibition without justification." American Trucking Ass'n v. Atchison, Topeka & Santa Fe Railway Co., 387 U.S. 397, 411, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967).
 
 
 36
 In addition, the Supreme Court has recognized that if a shipper permissibly performs services the carrier is bound to render, but is not paid because the amount and conditions of payment of such allowance have not been published, the proper recourse is by complaint to the Commission. General American Tank Corp. v. El Dorado Terminal Co., 308 U.S. at 430, 60 S.Ct. 325. The Supreme Court later confirmed that, in accordance with its opinion in General American Tank Corp., as well as the Interstate Commerce Act, the Commission was authorized to determine the reasonableness and legality of compensation for the shipper's past performance of services, such determinations being "matters which Congress had entrusted to the Commission." El Dorado Oil Works v. United States, 328 U.S. 12, 15-16, 66 S.Ct. 843, 845, 90 L.Ed. 1053 (1945). More recently, the Eighth Circuit reiterated that in the absence of a published allowance, the Commission "may provide for an allowance if requested." Chicago & Northwestern R. Co. v. Union Packing Co., 514 F.2d 30, 33 n. 3 (8th Cir. 1975) (citing General American Tank Corp., supra ).
 
 
 37
 Finally, the Commission itself has found on occasion that, even in the absence of a published allowance, a shipper may be entitled to allowances or, more appropriately, damages for its provision of services or instrumentalities. See, e. g., Paragon Refining Co. v. Alton & Southern Railroad, 118 I.C.C. 166 (1926); Borden's Farm Products Co. v. N. Y., N. H. & H. R. R. Co., 92 I.C.C. 270 (1924); Colorado & Utah Coal Co. v. Denver & Salt Lake R. Co., 85 I.C.C. 545 (1923); United Chemical & Organic Products Co. v. Director General, 73 I.C.C. 100 (1922); Lehigh Coal & Navigation Co. v. Penn. R. Co., 50 I.C.C. 543 (1918); W. C. Sterling & Son Co. v. Michigan Central R. R. Co., 21 I.C.C. 451 (1911).
 
 
 38
 In summary, there is sufficient authority to find that the Commission's construction of § 15(13) is misconceived and erroneous. Neither the terms of the statute nor the legislative history supports the Commission's position that § 15(13) operates, in the absence of a published allowance, to bar recovery for uncompensated services legitimately performed by a shipper. However, this does not resolve the matter because the question then presented is whether Antle legitimately supplied its trailers so as to be entitled to compensation by the connecting carriers.
 
 
 39
 The Commission suggested in its decision that recovery would be foreclosed in any event because of Antle's "voluntary" furnishing of the transportation instrumentalities involved. The Commission correspondingly embraces on appeal the district court's conclusion that Antle was not entitled to reparations in the absence of a demand on and consequent refusal of the connecting carriers to provide the refrigerated trailers before undertaking to supply the equipment itself. Thus, we must determine whether the connecting carriers' general obligation to pay an allowance in lieu of their furnishing the trailers was discharged under the applicable legal standard.
 
 
 40
 Simply because a shipper's undertaking to perform services or to furnish instrumentalities is voluntary, or to its advantage, or for its convenience does not necessarily excuse the carrier's obligation to make an allowance. See Interstate Commerce Commission v. Diffenbaugh, 222 U.S. at 45, 32 S.Ct. 22; United States v. Interstate Commerce Commission, 91 U.S.App.D.C. at 190, 198 F.2d at 970; United States ex rel. Members of Waste Merchants' Ass'n of New York v. Interstate Commerce Commission, 277 F. at 542. The proper inquiry appears to be not whether the shipper voluntarily performed transportation services but whether the shipper insisted on the right to perform or otherwise intervened so as to prevent performance by a willing carrier. See Atchison, Topeka & Santa Fe Railway Co. v. United States, 232 U.S. at 216, 34 S.Ct. 291; United States v. Interstate Commerce Commission,91 U.S.App.D.C. at 189, 198 F.2d at 969; United States ex rel. Members of Waste Merchants' Ass'n of New York v. Interstate Commerce Commission, 277 F. at 541-42. Cf. Borden's Farm Products Co. v. N. Y., N. H. & H. R. R. Co.,92 I.C.C. at 272-73; United Chemical & Organic Products Co. v. Director General, 73 I.C.C. at 102-03.
 
 
 41
 We find no evidence to substantiate the proposition that Antle prevented the connecting carriers from supplying trailers for transport of Antle's produce. Under the applicable tariff, the originating carriers assumed the responsibility of furnishing trailers for the transportation of freight from the shipper's dock. As the Hearing Examiner found below, the connecting carriers never furnished trailers for transport of Antle's produce; they accepted the carrier-supplied trailers at the interchange points and compensated the originating carriers for the use of those trailers while on their lines, as they must. See Clinchfield R. Co. v. Boston & Maine Corp., 258 F.Supp. 467 (S.D.N.Y.1968). The originating carriers provided for payment of an allowance when, At their option, Antle furnished the trailers for its shipments of produce. Antle sought a similar arrangement with the connecting carriers. Those carriers thereafter had notice that the trailers transporting Antle's produce were supplied by Antle and not the originating carriers, but they never protested the use of those trailers. On the contrary, they accepted Antle's trailers at the interchange point and treated them in the same manner as those trailers supplied by the originating carriers. In considering and finally refusing Antle's request for an allowance, the connecting carriers only expressed their concern about the amount and the practical and legal effects of an allowance, but never asserted their ability and willingness to provide the trailers or objected to the supposed usurpation of their right to do so.[14] Moreover, under Antle's proposal, the connecting carriers could have retained the option, as the originating carriers did, to furnish the trailers when they elected to do so. Thus, the connecting carriers were not and would not have been prevented in any manner from exercising their right to supply the trailers for shipment of Antle's produce. The carriers were not unwillingly relieved of their duties here.
 
 
 42
 In addition, while the connecting carriers may have a statutory obligation to generally furnish instrumentalities of transportation, under the tariff their obligation appears to be nothing more than the acceptance of the trailers at the interchange points for transportation and delivery to their destination. They never supplied trailers for transport of Antle's produce nor, apparently, did they consider themselves obligated under the tariff to do so. Thus, the substitution of Antle's trailers for the trailers previously supplied by the originating carriers did not interfere with the performance of the interchange function by the connecting carriers nor impose any additional burden which they could not have reasonably anticipated or met.
 
 
 43
 The Commission has also recognized the propriety of making an award in a case where the circumstances are not readily distinguishable from those here. In Paragon Refining Co. v. Alton & Southern Railroad, 118 I.C.C. at 166-168, an intermediate line refused to provide by tariff provision for payment of a mileage allowance for the use of an owner's tank cars moving over its lines. The line haul carrier paid the owner for the use of the cars over its own lines, but the switching line would not, even though it had paid an allowance on the cars supplied by the carriers. The Commission concluded that the refusal to pay the same allowance as was paid to the line haul carrier was an unreasonable practice. It not only awarded damages in the amount of allowances that should have been received but also set an allowance for the future.
 
 
 44
 Regardless of whether Antle "voluntarily" furnished the trailers here, there was no showing that Antle had prevented the connecting carriers from furnishing the trailers themselves or had acted inconsistently with the functions of the connecting carriers under the tariff. Consequently, we agree with the Hearing Examiner that the refusal to publish an allowance was an unreasonable practice in violation of § 1.
 
 
 45
 We conclude that Antle was entitled to an award of reparations. The Commission erred as a matter of law in dismissing Antle's complaint for reparations. To hold otherwise would result in an unjustifiable windfall to the connecting carriers. Finding that Antle was entitled to reparations under the applicable standard, we remand to the Commission for the fixing of the appropriate amount of reparations due Antle from each of the connecting carriers involved.
 
 PUBLICATION OF ALLOWANCES
 
 46
 The Commission has also asserted that it does not have the authority to compel the connecting carriers to publish an allowance for the future. It maintains that its power with respect to allowances is limited by § 15(13) only to determining and fixing the maximum allowance permissible.
 
 
 47
 When the Interstate Commerce Act was amended in 1906 to enlarge the powers of the Commission, Congress specifically denied any intention to authorize the Commission to initiate rates. However, to rectify the oppressive rates being charged then, the Commission was authorized to establish the maximum rate that might be enacted by the carriers. Similarly, Congress empowered the Commission to set maximum reasonable allowances to control excessive rebates prevalent at that time. The word "maximum" was used, according to Congress, to give flexibility and to permit the carriers to charge or pay less than the amount fixed by the Commission as a maximum. See H.Rep. No. 591, 59th Cong., 1st Sess. 5 (1906). Thus, Congress apparently did not anticipate the initiation of allowances by the Commission. But Antle has not requested that the Commission fix an allowance for the future. Instead it has asked only that the Commission require the connecting carriers to publish an allowance, the amount still to be determined by the carriers.
 
 
 48
 Compelling the connecting carriers here to publish an allowance neither exceeds nor is incompatible with the power granted to the Commission, but is inherent in its prescribed functions. In General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940), the Supreme Court observed that if a carrier does not provide for and publish an allowance, the shipper "may complain to the Commission, to the end that a proper allowance be ascertained and made effective by a schedule duly published." 308 U.S. at 430, 60 S.Ct. at 330. We agree that application to the Commission for this purpose is proper. We are further persuaded by the knowledge that the Commission itself has engaged to fix future as well as past allowances under circumstances where the railroad unreasonably refused to publish an allowance. See, e. g., Roach Creek Coal Mines, Inc. v. Ann Arbor Co., 157 I.C.C. 103, 109 (1927); Paragon Refining Co. v. Alton & Southern Railroad, 118 I.C.C. at 168. Moreover, we are not unmindful of the power granted the Commission in 1917 to enforce the railroad's duty to furnish safe and adequate car service. Section 1(14) of the Act provides in pertinent part:
 
 
 49
 "The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid . . . for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations, or practices."
 
 
 50
 We concur with the Hearing Examiner's suggestion that the power to require publication of an allowance may be implied from the power granted the Commission under § 1(14). See Paragon Refining Co. v. Alton & Southern Railroad, 118 I.C.C. at 166.
 
 
 51
 We therefore find that the Commission has the authority to order the connecting carriers that have not already done so to publish an allowance. To preserve the carrier's option to provide the trailers, the Commission may condition its order accordingly. See e. g., Roach Creek Coal Mines, Inc. v. Ann Arbor Car Co., 157 I.C.C. at 109. We see no necessity to decide at this time whether the Commission may fix the future allowance in its order compelling publication, but find no objection to the Commission offering guidelines to the carriers on the allowance to be set.
 
 
 52
 With respect to Antle's other contentions, we find that the Commission properly dismissed for lack of evidence Antle's charges of discriminatory practices in violation of § 3 of the Act. We also concur with the Commission's finding that the originating carriers could not be required to place their reporting marks upon Antle's trailers or to collect on Antle's behalf the rentals from the connecting carriers. Finally, we agree with the district court that the issue whether the originating carriers breached their duty to supply adequate car service was never litigated before the Commission and therefore cannot now be considered on appeal.
 
 
 53
 The judgment of the district court, to the extent that it relieved the connecting carriers of liability to Antle, is reversed. We remand to the Commission with directions to ascertain the amount of compensation due Antle and to compel any carrier that has not done so to publish an allowance.
 
 
 54
 REVERSED and REMANDED.
 
 
 
 [1]
 The Commission's decision is reported at 343 I.C.C. 351 (1973)
 
 
 [2]
 A three-judge district court was initially convened to hear the case pursuant to 28 U.S.C. § 2325 (now repealed), with appeal directly to the Supreme Court under 28 U.S.C. § 1253. The district court subsequently concluded that the matter could be properly determined by a one-judge tribunal. We agree. See United States v. Interstate Commerce Commission, 337 U.S. 426, 440-43, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949) (judicial review of an ICC order denying reparations does not require a three-judge court)
 
 
 [3]
 Those railroads are the Erie Lackawanna Railway Company (Erie), the Delaware & Hudson Railway Company (D & H), the Boston & Maine Corporation (B & M), and the Penn Central Transportation Company (Penn Central)
 
 
 [4]
 Tariff 64-N, the only tariff under which Antle could ship its produce at the time in controversy, provides in relevant part:
 "Item 1080 Circle Reference (2)
 Rates apply only when consignee accepts delivery of loaded trailers at railroad ramp at destination, performs a delivery service including unloading of freight from trailers and returns empty trailers to carrier at same location. . . .
 (and)
 Item 120
 Rates published in this tariff apply only on freight in or on trailers or demountable trailer bodies supplied and transported by carrier from consignor's dock . . . Such service will be furnished by carrier only upon reasonable request therefor. . . ."
 
 
 [5]
 The TOFC plan offered under Tariff 64-N was a variation of TOFC Plan II where the carrier supplies pickup, as in this case, or delivery service but not both, as Plan II provides. For a description of the different TOFC service plans, See American Trucking Ass'ns v. Atchison, Topeka & Santa Fe Railway Co., 387 U.S. 397, 403, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967); Cooper-Jarrett, Inc. v. United States, 226 F.Supp. 318, 320-21 (W.D.Mo.1964); Ex parte 230, Substituted Service (Piggyback Service), 322 I.C.C. 301, 304-05, 309-311 (1969)
 
 
 [6]
 The growth of TOFC service has been explosive. American Trucking Ass'ns v. Atchison, Topeka & Santa Fe Railway Co., 387 U.S. at 401-03, 87 S.Ct. 1608. Congress has acknowledged that chronic shortages of cars presents a serious problem to shippers in the transport of agricultural products. H.Rep.No.1183, 89th Cong., 2d Sess. 1, Reprinted in (1966) U.S.Code Cong. & Admin.News, pp. 2227, 2228. See United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 748-51, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972)
 
 
 [7]
 The agreement provides in relevant part:
 "1. Antle trailers, and containers and bogies, containing shipments of Antle, referred to herein collectively as 'equipment,' or accepted by Railroad in interchange or otherwise, may be used in transportation service by Railroad . . .
 "2. Said equipment shall be considered in possession of or under control of Railroad and under the provisions of this agreement from the time it reaches Railroad in interchange with another railroad, or from the time said equipment is otherwise delivered to and Railroad accepts same, until delivered by Railroad to a connecting line haul railroad, or released to Antle at railroad ramp, or, constructively, by notification to Antle of availability at ramp.
 "3. Rental charges to be paid by Railroad to Antle, in accordance with applicable AAR Rules, for each calendar day, Sundays and holidays included, that each unit of equipment is in possession or under control of Railroad shall be:
 Trailers or Containers:
 $12.00 per calendar day, when loaded with perishable commodities.
 $8.00 per calendar day, when not loaded with perishable commodities.
 "12. It is understood and agreed that equipment may be interchanged freely by Railroad with other line haul railroads and in such event Antle shall arrange with other line haul railroads rental charges for equipment."
 
 
 [8]
 Southern Pacific's tariff provides in relevant part:
 "When at railroad's option shipper furnishes a refrigerated trailer or container and bogie capable of maintaining controlled temperature to accommodate his shipment, an allowance will be paid to the shipper for the time his trailer is in possession of this carrier. . . ."
 
 
 [9]
 Erie, the principal connecting carrier, eventually published an allowance effective September 26, 1970. It provides in relevant part:
 "When a shipper-owned refrigerated trailer, or container and bogie, capable of maintaining controlled temperature to accommodate his shipment . . . is received in interchange, on the car, from connecting Railroads . . ., an allowance will be paid to the shipper for the time his trailer or container and bogie is in possession of this carrier . . ."
 It is our understanding that all appellee railroads but the D & H have now published allowances. Because D & H has still not published an allowance (at least we have not been informed otherwise), the issue whether the Commission may compel a carrier to publish an allowance is not moot.
 
 
 [10]
 49 U.S.C. §§ 1(4), 1(5), 1(6), 1(11), 3(1), 3(4) and 15(13), now 15(15) (Supp.1978)
 
 
 [11]
 To avoid confusion, we will refer to § 15(15) by its previous numerical designation: § 15(13)
 
 
 [12]
 49 C.F.R. §§ 1100.43 1100.52 (1977). Essentially, the modified procedure permits the disposition of a complaint without an oral hearing if it appears that "substantially all important issues of material fact may be resolved by means of written materials." The parties are required to file a verified statement of facts, arguments and exhibits upon which the party relies. We do not find this procedure particularly satisfactory in this case as the record is not as complete as we would prefer. We believe, however, that we can proceed on the record before us and need not remand for an oral hearing
 
 
 [13]
 More fully, these sections provide in relevant part:
 " § 1, par. (4). Duty to furnish transportation and establish through routes; division of joint rates. It shall be the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefor, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto . . . It shall be the duty of every such common carrier establishing through routes to provide reasonable facilities for operating such routes and to make reasonable rules and regulations with respect to their operation, and providing for reasonable compensation to those entitled thereto; and in case of joint rates, fares, or charges, to establish just, reasonable, and equitable divisions thereof, which shall not unduly prefer or prejudice any of such participating carriers.
 " § 1, par. (5). Just and reasonable charges; applicability; criteria for determination
 (a) All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful. The provisions of this subdivision shall not apply to common carriers by railroad subject to this part.
 (b) Each rate for any service rendered or to be rendered in the transportation of persons or property by any common carrier by railroad subject to this chapter shall be just and reasonable. A rate that is unjust or unreasonable is prohibited and unlawful . . .
 " § 1, par. (6). Classification of property for transportation; regulations and practices; demurrage charges
 It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation . . . and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful. Demurrage charges shall be computed, and rules and regulations relating to such charges shall be established, in such a manner as to fulfill the national needs with respect to (a) freight car utilization and distribution, and (b) maintenance of an adequate freight car supply available for transportation of property.
 " § 1, par. (11). Duty to furnish car service; rules and regulations. It shall be the duty of every carrier by railroad subject to this chapter to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful."
 
 
 [14]
 Erie finally asserted its ability and willingness to furnish the trailers in response to Antle's complaint. It did not provide any evidence in support of that assertion. As the Hearing Examiner noted, the credibility of Erie's claim is subject to question